Leonard CAMPBELL et al.

v.

Anderson McGRUDER, Superintendent,
Detention Services, et al.,
Appellants (two cases).

Nos. 75–1350 and 75–2273.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 26, 1976.

Decided March 30, 1978.

**524**

David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief for appellants. Thomas R. Nedrich, Asst. Corp. Counsel, Washington, D. C., also argued for appellants.

J. Patrick Hickey, Washington, D. C., for appellees.

Before BAZELON, Chief Judge, and LEVENTHAL and MACKINNON, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

Opinion filed by MACKINNON, Circuit Judge, dissenting in part and concurring in part.

BAZELON, Chief Judge:

Plaintiffs, a class consisting of pretrial detainees incarcerated at the District of Columbia Jail,[1] brought this action in 1971 seeking declaratory and injunctive relief against allegedly unconstitutional conditions at that facility. Following trial, the District Court entered an interim order on March 21, 1975, requiring the defendant city officials, *inter alia*, to cease housing pretrial detainees in any space smaller than 48 square feet per inmate within 15 days. On November 5, 1975, the District Court issued an order setting requirements for seven additional facets of the Jail's administration.[2] A second order concerning overcrowding was issued on May 24, 1976.[3] It sets limits on the total number of inmates that could be housed at the Jail and established a procedure for reducing the inmate population should those limits be exceeded. The defendants appeal from these orders on a variety of grounds.

## I. COMITY AND ABSTENTION

At the outset, appellants claim that "the doctrines of comity and abstention preclude the federal courts of the District of Columbia from making class-based rulings concerned with the asserted rights of prisoners at the D.C. Jail . . . against whom criminal prosecutions are pending in the District of Columbia Superior Court." Brief for appellants at 1. More specifically, appellants argue that abstention is appropriate here because (1) federal courts generally should refrain from using their injunctive powers to interfere with the administration of local government, especially with prisons; (2) the local Superior Court should be given an initial opportunity to hear appellees' claims; and (3) the District Court's

---

1. Although D.C. statutes provide a number of grounds for committing pretrial detainees to the D.C. Jail, the vast majority are committed in lieu of bond. *See* note 12 *infra*. For a comprehensive breakdown of the Jail's population, see notes 22, 31, 34 and 48 *infra*.

2. *See* 416 F.Supp. 100, 106 (D.D.C.1975).

3. *See* 416 F.Supp. 111 (D.D.C.1976).

order requiring defendants to reduce the prison population when overcrowding occurs might interfere with subsequent criminal proceedings in the Superior Court.

■ As we have stated before, "[i]t may well be that the abstention doctrine is rooted in federalism interests which—with all their historic underpinnings, the tension between federal powers and state sovereignty, and the concern for local political autonomy—make the abstention doctrine inapposite in the unique District."[4] But even assuming that this doctrine applies fully to the federal courts' relations with the D.C. Superior Court, the present case falls into none of the three traditional categories of abstention.

First, this is not a case "in which the federal constitutional issue might be mooted or 'presented in a different posture' by a state court determination of pertinent state law." *Zwickler v. Koota,* 389 U.S. 241, 256, 88 S.Ct. 391, 400, 19 L.Ed.2d 444 (1967) (Harlan, J., concurring). Here, there is no inadequately defined local law whose further interpretation might obviate consideration of the federal constitutional issue.[5]

Nor is this a case "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case . . . at bar." *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The prime example of this category of abstention is *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), where the exercise of federal jurisdiction threatened systematic disruption of complex state policies developed via the review of state Railroad Commission orders by state courts ex-

perienced in that particular area of local regulation. Here, the local courts have been assigned no special review function over the administration of the D.C. Jail, nor is any widespread disruption of a unified scheme of local regulation threatened by the exercise of federal jurisdiction. Although prudence and comity may recommend the involvement of the local judiciary in correcting unconstitutional conditions at the *Jail after plaintiffs' claims have been* adjudicated, there is no basis—neither in the nature of the legal issues presented here nor in the expertise of the local courts in local law—for insisting that only local courts decide the questions of federal constitutional law involved in this case. The mere fact that a federal claim brought in federal court might instead have been brought in state court does not justify abstention. *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 677 n.5, 54 L.Ed.2d 618 (1978); *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Alabama Pub. Serv. Comm'n v. Southern R. Co.,* 341 U.S. 341, 361, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring).

Finally, this case does not fall into the third category of abstention, which "is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Douglas v. City of Jeanette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), state nuisance proceedings antecedent to a criminal prosecution, which are directed at obtaining the closure of places exhibiting obscene films, *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); or collec-

---

4. *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 52 n.35, 478 F.2d 938, 962 n.35, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). *Cf. Palmore v. Superior Court of Dist. of Columbia,* 169 U.S.App.D.C. 323, 515 F.2d 1294 (1975), *judgment vacated and remanded for further consideration in light of Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), 429 U.S. 915, 97 S.Ct. 305, 50 L.Ed.2d 280 (1976).

5. The Supreme Court has made clear "that the opportunity to avoid decision of a constitutional question does not alone justify abstention by a federal court. . . . Indeed, the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention." *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 815 n.21, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976) (citations omitted).

tion of state taxes, *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943)." *Colorado River Water Cons. Dist. v. United States*, 424 U.S. at 816, 96 S.Ct. at 1246 (footnotes omitted). The District Court has enjoined no proceeding in the Superior Court, nor is there any pending litigation there in which appellees could raise their claims.[6] It is not enough that the remedy ordered by the federal court might have some effect on proceedings in the Superior Court.[7]

Appellants rely heavily on *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), for the proposition that federal courts should refrain from issuing injunctions "against those in charge of an executive branch of an agency of state or local governments . . . ." *Id.* at 380, 96 S.Ct. at 608. But the teaching of *Rizzo* is not so broad. That case actually holds that a federal court should refrain from assuming a comprehensive supervisory role via its injunctive powers over broad areas of local government for the purpose of preventing speculative and probably only sporadic future misconduct by local officials toward an imprecise class of potential victims, especially when that misconduct is not part of a pattern of persistent and deliberate official policy. The case at bar stands in clear contrast to the situation in *Rizzo*. Here,

the constitutional violations are alleged to have actually affected the entire, clearly defined plaintiff class and to have stemmed from continuing policies of the Department of Corrections, so that only injunctive relief classwide in scope can effectively end the multiple and continuing wrongs.[8]

Although we do not read *Rizzo* as requiring total abstention, we are not insensitive to its more general admonition against excessive intervention in local government. A federal court must practice special restraint in the exercise of its injunctive powers in this area, presuming that local officials will comply with the law in good faith and leaving them as much room as possible to devise their own methods of compliance. However, a federal court may not shave the requirements of the Constitution to fit the desires of local officials, nor should it continue to accord these defendants special deference in the fashioning of relief when the presumption of good faith has proved misplaced.

In short, although we are bound to respect the prerogatives of the local government, both judicial and executive, we conclude that abstention is inappropriate in this case. As Justice Powell stated in *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):

**6.** Contrary to appellants' assertions, plaintiffs could not raise as a defense to the criminal charges pending against them in Superior Court the unconstitutionality of the conditions of their confinement. *See Gerstein v. Pugh*, 420 U.S. 103, 108 n.9, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

**7.** Only one aspect of the District Court's order could conceivably affect criminal proceedings pending against appellees in the Superior Court. Having given protracted attention to ways of enlarging the Jail's capacity and moving convicted inmates to other facilities, the District Court directed that if overcrowding nevertheless persisted, the appellants should release pretrial detainees beginning with those "held in default of the lowest amount of bail." *See* note 43 *infra*. If appellants seriously pursue the alternatives specified by the District Court, there should be no need to resort to this course of action. But even if release of detainees should become necessary, the risk of disruption to Superior Court proceedings seems slight. The District Court's order provides for

the release of those who would have been released pending trial but for their ability to make bail. *See* note 12 *infra*. Moreover, the District Court specified that the manner of releasing detainees in the event of overcrowding may be revised by the judges of the Superior Court, thus allowing for minimization of disruption to their proceedings. *See* note 43 *infra*.

**8.** Cf. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In that case, pretrial detainees challenged the Florida practice of detaining suspects arrested for noncapital crimes solely on the basis of an information filed by a state prosecutor. Holding that the Fourth Amendment required the state to provide a judicial determination of probable cause before or after arrest, the Supreme Court stated that the "District Court correctly held that the respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions . . . ." *Id.* at 108 n.9, 95 S.Ct. at 860.

[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.[9]

Confronted with constitutional violations, other circuits have upheld federal injunctions aimed at state and local correctional systems, thereby expressly or implicitly finding abstention improper. *See Battle v. Anderson*, 564 F.2d 388, 391–93 (10th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977); *Costello v. Wainwright*, 539 F.2d 547 (5th Cir. 1976) (en banc) (upholding refusal to abstain but ordering 3-judge court), *reversed on other grounds*, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977) (reversing and remanding on issue of 3-judge court), *on remand*, 553 F.2d 506 (5th Cir. 1977) (en banc) (panel opinion otherwise reinstated); *McRedmond v. Wilson*, 533 F.2d 757 (2d Cir. 1976); *Inmates of San Diego County Jail v. Duffy*, 528 F.2d 954 (9th Cir. 1975); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392 (2d Cir. 1975); *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974), *on subsequent appeal*, 527 F.2d 1041 (2d Cir. 1975); *Taylor v. Sterrett*, 499 F.2d 367 (5th Cir. 1974), *cert. denied*, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975), *on subsequent appeal* 527 F.2d 856 (5th Cir. 1976); *Inmates of Suffolk County Jail v. Eisenstadt*, 494 F.2d 1196 (1st Cir.), *cert. denied*

sub nom. *Hall v. Inmates of Suffolk County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974), *on subsequent appeal*, 518 F.2d 1241 (1st Cir. 1975); *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968).

## II. THE CONSTITUTIONAL STANDARD

Our inquiry must begin with the premise that the pretrial detainees who fill the District of Columbia Jail are presumed innocent. They are unconvicted of any crime. Strictly speaking, therefore the District has no authority to "punish" them at all. Over two hundred years ago Blackstone said of this "dubious interval" between commitment and trial:

Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county goal by the *mittimus* of the justice . . .; there to abide till delivered by due course of law . . . . But this imprisonment, as has been said, is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only . . .

4 W. Blackstone, Commentaries * 300.

Despite the presumption of innocence, our common law and constitutional heritage has refused to abjure the institution of pretrial detention. The standards by which the constitutionality of conditions of pretrial confinement are to be measured are thus rooted in paradox. No simple or even clear tests can grow from such crevices of constitutional logic. The standards we evolve must acknowledge and account for

---

**9.** Pretrial detainees generally retain more rights than convicted prisoners. *See* pp. —— of 188 U.S.App.D.C., p. 529 of 580 F.2d *infra*. Hence, the federal courts' "duty to protect constitutional rights" conceivably may justify more intrusive relief with pretrial detainees

than with sentenced inmates. *See Anderson v. Nosser*, 438 F.2d 183, 190 (5th Cir. 1971), *modified in other respects*, 456 F.2d 835, (5th Cir), *cert. denied sub nom. Nosser v. Bradley*, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

numerous competing and conflicting interests. They must be guided, however, by the end set out by Blackstone, that the pretrial detainee "be used with the utmost humanity."

Basic to our analysis is the interest of the government in "enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). "[T]he State's duty to control crime," *Gerstein v. Pugh*, 420 U.S. 103, 112, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975), justifies in the first instance the institution of pretrial detention. To imprison a person prior to trial, the government must meet constitutional[10] and statutory[11] standards. The government's primary purpose is the confinement of the detainee to ensure his presence at trial. Indeed, the Seventh Circuit has held that,

as a matter of due process, pre-trial detainees may suffer no more restrictions than are reasonably necessary to ensure their presence at trial. While the decisions that have interpreted the Cruel and Unusual Punishment Clause may be valuable by analogy as defining that which may never be imposed on any inmate, whether convicted prisoner or pre-trial detainee, a more stringent standard controls the treatment by the state of pre-trial detainees. Since they are convicted of no crime for which they may presently be punished, the state must justify any conditions of their confinement solely on the basis of ensuring their presence at trial. Any restriction or condition that is not reasonably related to this sole stated purpose of confinement would deprive a detainee of liberty or property without due process, in contravention of the Fourteenth Amendment.

*Duran v. Elrod*, 542 F.2d 998, 999–1000 (7th Cir. 1976).[12]

---

**10.** The constitutional standard that must be satisfied before pretrial detention is permitted is the same as that for arrest—"probable cause to believe the suspect has committed a crime." *Gerstein v. Pugh*, 420 U.S. 103, 120, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975). Also, of course, pretrial detention may not violate a detainee's "right to bail." *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951).

**11.** Under D.C. law, several categories of suspects may be detained by court order pending trial:

First, a person accused of a noncapital offense who (a) is unable to meet financial conditions of release imposed by a judicial officer to "assure the appearance of the person as required" or (b) is unable to meet nonfinancial conditions imposed for "the safety of any other person or the community." 23 D.C.Code § 1321.

Second, a person accused of certain "dangerous crimes" if the Government certifies that no condition or combination of conditions could be imposed that would "reasonably assure the safety of the community." 23 D.C.Code § 1322(a)(1).

Third, a person who is charged with certain crimes of violence and has a history of such crimes and is found likely to endanger others despite the imposition of conditions. 23 D.C. Code § 1322(a)(2).

Fourth, a person charged with any offense, "if such person, for the purpose of obstructing or attempting to obstruct justice, threatens, injures, intimidates, or attempts to threaten, injure, or intimidate any prospective witness or

juror," and if such person is found to endanger others despite the imposition of conditions. 23 D.C.Code § 1322(a)(3).

Fifth, a person charged with any offense who is on probation, parole, or mandatory release pending completion of sentence in any jurisdiction if such person "may flee or pose a danger to any other person or the community if released." 23 D.C.Code § 1322(e).

Sixth, a person charged with a crime of violence who is suspected of being, or found to be, an addict. 23 D.C.Code § 1323.

Seventh, a person charged with a capitol offense who is found likely to flee or pose a danger to others despite the imposition of conditions. 23 D.C.Code § 1325.

**12.** We note, however, that in the District of Columbia the government has additional interests in pretrial confinement, such as ensuring the safety of the community or the integrity of the judicial process. *See* note 11 *supra; Cf. Blunt v. United States*, 322 A.2d 579 (D.C.App. 1974).

Pretrial imprisonment for purposes other than inability to make bail, however, is relatively rare, and, as the Third Circuit has pointed out, "the only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial." *United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823, 827 (3d Cir. 1976). *See* 23 D.C.Code § 1321(a): "No financial condition may be imposed to assure the safety of any other person or the community."

In the instant case, the District Court found that for the spring of 1976, 90 to 95% of those

If the government could confine or otherwise infringe the liberty of detainees only to the extent necessary to ensure their presence at trial, house arrest would in the end be the only constitutionally justified form of detention. Since this would render pretrial detention a virtual impossibility and thus frustrate the government's interest in protecting the safety of the community, we must acknowledge as an aspect of that interest the government's ability to manage the institution of pretrial detention in an administratively feasible manner. The government may thus use jails as places of confinement and may make the everyday administrative decisions necessary to run them. The justifications for these decisions cannot be logically deduced from any single goal, such as the need to maintain the security of the jail, since they ultimately derive from the basic necessity of managing the jail itself.[13] The myriad of prosaic details involved in that enterprise—the choice of menus, the assignment of cells, the scheduling of recreation and other events—take on a life independent of the primary justifications of the confinement.

■ Standing against these government interests is the liberty interest of the pretrial detainee. The detainee is not in the position of the convicted prisoner who has been "constitutionally deprived of his liberty to the extent that the State may confine him and to subject him to the rules of its prison system." *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). *See Bounds v. Smith*, 430 U.S. 817, 840, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (Rehnquist, J., dissenting). The liberty interest of the pretrial detainee is rooted in the presumption of innocence. There is no doubt that pretrial detainees do have the protection of this presumption. *See McGinnis v. Royster*, 410 U.S. 263, 273, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Pugh v. Rainwater*, 557 F.2d 1189, 1191–92, 1197 (5th Cir.), *petition for rehearing en banc granted*, 562 F.2d 362 (5th Cir. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 397 (2d Cir. 1975). To construe this presumption as "largely irrelevant to . . . pretrial *confinement*," dissenting op. at —— of 188 U.S. App.D.C., at 568 of 580 F.2d, is, we believe, profoundly to misconstrue it. The presumption of innocence is a shield that prevents "the infliction of punishment prior to conviction." *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951).[14]

detained by order of court were held in lieu of bond, the remainder consisting mostly of those sentenced to incarceration at the Jail. *See* note 22 *infra.* (And approximately half of these 90–95% were persons charged with misdemeanor offenses. *See* note 34 *infra.*) At the time of trial, the Jail held 565 unsentenced inmates. Of these, 83 were detained on no bond because they had been convicted and were awaiting sentencing; 3 were held in default of $100,000 or more bond; 11 were held on bond of $50,000 to $99,000; 180 were held on bond of $5,000 to $49,000; and 288 were held on bond of $4,900 or less. Trial Tr. 1070.

13. *See Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 397 (2d Cir. 1975):

Pretrial detainees are no more than defendants waiting for trial, entitled to the presumption of innocence, a speedy trial and all the rights of bailees and other ordinary citizens except those necessary to assure their presence at trial and the security of the prison. In providing for their detention, correctional institutions must be more than mere depositories for human baggage and any deprivation or restriction of the detainees' rights

beyond those which are necessary for confinement alone, must be justified by a compelling necessity.

*See Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974).

14. There are important reasons why the presumption of innocence should continue to protect a defendant held in pretrial detention. The presumption rests in the first instance on the possibility of mistake inhering in the process of arrest and prosecution. To protect the community from crime, government may arrest a person on a showing of probable cause and incarcerate him until trial for various reasons set by statute. But as the Supreme Court has noted, "[i]n dealing with probable cause . . . we deal with probabilities." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Persons may be detained on evidence less than necessary to prove guilt beyond a reasonable doubt "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous" and "room must be allowed for some mistakes on their part." *Id.* at 176, 69 S.Ct. at 1311. Despite the oversight of a neutral judi-

The pretrial detainee does not suffer the stigma associated with conviction,[15] but otherwise it is difficult to distinguish pretrial incarceration from punishment. *See Pugh v. Rainwater*, 557 F.2d 1189, 1198 (5th Cir.), *petition for rehearing en banc granted*, 562 F.2d 362 (5th Cir. 1977). For example, federal statute requires the Attorney General to give any convicted person "credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed." 18 U.S.C. § 3568. Since all prisoners convicted in the District of Columbia are committed for the term of their imprisonment to the custody of the Attorney General, 24 D.C. Code § 425, should any of the plaintiffs in this case be convicted and sentenced, they will receive credit for their time in the D.C. Jail. The equivalence between pre- and post-trial incarceration is further recognized by the settled doctrine requiring "time a defendant spends in jail before sentence because he is unable to raise bond [to be] credited if he is later sentenced to a maximum term." *Hook v. Arizona*, 496 F.2d 1172, 1174 (9th Cir. 1974). *See Corley v. Cardwell*, 544 F.2d 349 (9th Cir. 1976),

*cert. denied*, 429 U.S. 1048, 97 S.Ct. 757, 50 L.Ed.2d 763 (1977); *Durkin v. Davis*, 538 F.2d 1037 (4th Cir. 1976); *Parker v. Estelle*, 498 F.2d 625 (5th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).[16]

Not only is pretrial detention itself indistinguishable from punishment, each additional restriction required by the jail environment contributes to the severity of that punishment. Nearly every stricture of the jail's regimen will prevent the pretrial detainee from doing what he would be otherwise free to do. The very conditions of confinement are additional deprivations of liberty. They are also punishment, *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 321–22, 18 L.Ed. 356 (1867); *Brown v. Wilemon*, 139 F.2d 730, 732 (5th Cir.), *cert. denied sub nom.*, *Wilemon v. Bowles*, 322 U.S. 748, 64 S.Ct. 1151, 88 L.Ed. 1579 (1944), and, as the restrictions of the jail accumulate, the detainees's punishment becomes more severe.

To conclude that the conditions of pretrial imprisonment are virtually indistinguishable from those of punishment is only to restate the paradox of pretrial detention.

---

cial officer, the chance of error persists because the determination of probable cause need not be made in an adversary proceeding with the safeguards of appointed counsel and cross-examination of witnesses. *See Gerstein v. Pugh*, 420 U.S. 103, 122–23, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); 23 D.C.Code § 561(a)(1). Although the dissent argues that "[u]nder the existing Bail Reform Act of the District of Columbia (D.C.Code § 23–1324), accused persons who should not be detained in jail pretrial are *not* detained," dissenting op. at —— of 188 U.S.App.D.C., at 568 of 580 F.2d, we feel constrained to point out that the record demonstrates that nearly all of the unconvicted pretrial detainees who constitute the plaintiffs in this case are in jail for the reason that they cannot afford bail. *See* note 12 *supra.*

Finally, it is important to note that if the presumption of innocence is to be respected by judge and jury in the courtroom, it must be treated as an article of faith by all of society outside the courtroom as well. Without widespread acceptance of the presumption of innocence, we have less hope that juries will not take indictments as sufficient proof of guilt and that acquittals will wash the taint from the reputation of the mistakenly accused.

**15.** Even without the stigma of conviction, however, pretrial detention may permanently damage the detainee's reputation.

**16.** The rule rests on the Supreme Court's holding in *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), that a prisoner may not be confined for more than the maximum period of imprisonment provided by statute because he fails to pay a fine by reason of indigency. Although *Williams* rested on an equal protection rationale, it first had to adopt the premise that default imprisonment was in fact "a part of the punishment" exacted by statute. *Id.* at 240, 243–44, 90 S.Ct. 2018. The doctrine that the total of pre- and post-trial imprisonment cannot exceed the statutory maximum implicitly must adopt the same premise.

A number of circuits, however, have begun to expand the doctrine, some by crediting pretrial detention although the total period of pre- and post-trial incarceration does not exceed the maximum possible sentence, *see Faye v. Gray*, 541 F.2d 665 (7th Cir. 1976); *King v. Wyrick*, 516 F.2d 321 (8th Cir. 1975), others by crediting pretrial detention for non-bailable offenses. *See Vickers v. Haynes*, 539 F.2d 1005 (4th Cir. 1976).

The hard fact is that the presumption of innocence is in this context qualified by the need of the state to protect the safety of the community. The constitutionality of the conditions of pretrial confinement can thus be measured only by balancing against this governmental need the liberty interests of the pretrial detainee. Although in this balancing process there can unfortunately be no bright lines, there are several important guideposts that will inform our consideration.

■ First, although infringements on liberties not deemed fundamental might not in general be subject to the strictest scrutiny, *see Kelley v. Johnson*, 425 U.S. 238, 244, 248, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *East Hartford Educ. Ass'n v. Board of Educ. of East Hartford*, 562 F.2d 838 at 861 (2d Cir. 1977) (en banc), each deprivation of the jail environment renders pretrial detention more severe as punishment and thus further violates the presumed innocence of the pretrial detainee. The presumption of innocence is "constitutionally rooted," *Cool v. United States*, 409 U.S. 100, 104, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972); it is "axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895). We cannot permit this vital presumption to be eaten away by the cumulative conditions of pretrial detention. Therefore each restriction of the jail regimen must be carefully examined to determine if it is justified by substantial necessities of jail administration. To evaluate these necessities we will look to the needs of the state to produce the detainee for trial, to maintain the security of the jail, or generally to sustain the institution of pretrial detention at a feasible cost.

■ Second, the presumption of innocence requires that, to as great an extent as practically possible, the pretrial detainee leave jail no worse off than he entered it. Even with respect to convicted prisoners, the state acquires the responsibilities of a caretaker upon incarceration. "[P]risoners are guaranteed the provision of life's basic necessities for the period of their confinement. Constitutional doctrine has absorbed the common law view that '[i]t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.' *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926). Federal courts, though reluctant to intervene in the daily operation of penal institutions, have required those institutions to provide adequate food, clothing and shelter for their charges." *Bowring v. Godwin*, 551 F.2d 44, 46–47 (4th Cir. 1977). *See Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974). The presumption of innocence requires that these caretaking responsibilities be even greater with respect to pretrial detainees. Therefore, conditions of confinement that are likely to impair a detainee's mental or physical health should be subjected to the closest scrutiny and can be justified only by the most compelling necessity.

■ Third, pretrial detention occurs in the important interval directly preceding trial. The conditions of pretrial confinement cannot be permitted negatively to affect the outcome of the criminal process. There is disturbing evidence, however, that "the defendant at liberty pending trial stands a better chance of not being convicted or, if convicted, of not receiving a prison sentence." Ares, Rankin & Sturz, *The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole*, 38 N.Y.U.L.Rev. 67, 86 (1963). *See McGinnis v. Royster*, 410 U.S. 263, 281–83, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973) (Douglas, J., dissenting); Vera Institute of Justice, Programs in Criminal Justice Reform: Ten-Year Report 1961–1971, at 31 (1972). There is reason to believe that this disparity cannot be accounted for by a defendant's "prior record, bail amount, type of counsel, family integration [or] employment stability," Rankin, *The Effect of Pretrial Detention*, 39 N.Y.U.L.Rev. 641, 655 (1964), nor by "the seriousness of the charge, prior criminal record, [or] weight of the evidence."

*Money Bail as a Denial of Equal Protection,* Memorandum submitted by the Legal Aid Society of the City of New York in *Bellamy v. Judges and Justices,* 41 A.D.2d 196, 342 N.Y.S.2d 137, *aff'd,* 32 N.Y.2d 886, 346 N.Y. S.2d 812, 300 N.E.2d 153 (1973) in A. Goldstein and L. Orland, Criminal Procedure 451–52 (1974).[17] There are various explanations offered for this disparity. For one thing, "[t]he limitations imposed by incarceration hamper preparation of the defense . . . ." President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 38 (1967). For another, pretrial detainees plead guilty more often than bailed defendants. Note, *A Study of the Administration of Bail in New York City,* 106 U.Pa.L.Rev. 693, 726 (1958). It has been suggested that this is due to a defendant's knowledge "that, at worst, a guilty plea will result in his transfer to prison, where conditions are generally less cramped and uncomfortable than in the jails." Note, *The Jailed Pro Se Defendant and the Right to Prepare a Defense,* 86 Yale L.J. 292, 307 n. 66 (1976). Conditions of confinement that impede a defendant's preparation of his defense (apart, of course, from the fact of confinement itself), or that are so harsh or intolerable as to induce him to plead guilty, or that damage his appearance or mental alertness at trial,[18] are constitutionally suspect and can be justified only by the most compelling necessity.

■ Fourth, the responsibilities of the jail increase as the period of the detainee's incarceration grows longer. Conditions that might be tolerable for ten days, might be unacceptable if imposed for a month or longer.

■ Finally, we will not engage in balancing to determine the constitutionality of conditions of pretrial confinement if they are otherwise violative of the Constitution. For example, conditions of confinement could breach the standards of the Eighth Amendment. Although, strictly speaking, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions," *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977), we join the Second Circuit in holding that "a detainee is entitled to protection from cruel and unusual punishment as a matter of due process . . . ." *Rhem v. Malcolm,* 507 F.2d 333, 337 (2d Cir. 1974).[19] The conditions of confinement of pretrial detainees in a jail could also violate the Equal Protection Clause of the Fourteenth Amendment if, without adequate justification, they are more restrictive than the conditions of confinement of convicted prisoners in a penitentiary.[20] However, differences in the

17. The memorandum was based upon a statistical study of 857 defendants. The study found that:

> Those who stay in jail for lack of bail money are much more often convicted and, when convicted, go to prison more often and get much longer prison sentences than those who make bail. More significantly, however, even when factors which are specified in the Criminal Procedure Law as relevant to bail and which might be thought to affect the outcome—such as the seriousness of the charge, prior criminal record, weight of the evidence, amount of bail, community ties and employment history—are held constant, there is still a large disparity in results between the detained and the released. The study shows that pre-trial detention itself causes the detained to be more often convicted and to be sentenced more severely than the released.

18. For an example of such a condition, *see Dillard v. Pitchess,* 399 F.Supp. 1225, 1236 (C.D.Cal.1975).

19. This is in accordance with the directive of the Supreme Court that, "Where the State seeks to impose punishment without . . . an adjudication [of guilt], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Ingraham v. Wright,* 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). It also preserves the essential insight that pretrial incarceration is virtually indistinguishable from post-trial imprisonment, *cf. id.* at 669–71, 97 S.Ct. 1401, and therefore that the same constitutional standards should apply to both as a measurement of cruel and unusual punishment.

20. The Second Circuit has held that equal protection forbids "unjustifiable confinement of detainees under worse conditions than convicted prisoners" within the same penal system.

conditions of the two institutions would not, on their face, be sufficient to establish a constitutional violation, since such differences might be attributable to the distinct nature and functions of the two institutions. *See McGinnis v. Royster*, 410 U.S. 263, 270–73, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973).

Applying this variable standard, our task is to review the finding of the District Court that various practices and conditions at the D.C. Jail violated the constitutional rights of pretrial detainees. The constitutional standard employed by the District Court, however, was somewhat ambiguous.[21] There are therefore three questions before us: (1) Are the factual findings of the District Court as to conditions at the Jail clearly erroneous? If not, we must

accept them. (2) If these factual findings stand, do they provide a predicate for the lower court's determination that there has been a denial of constitutional rights? (3) If yes, should the District Court have granted the particular relief it did?

As a framework for the consideration of these questions, we turn first to a description of the District of Columbia Jail.

## III. A DESCRIPTION OF THE DISTRICT OF COLUMBIA JAIL

The District of Columbia Jail houses both pretrial detainees and convicted prisoners. The population varies but during this litigation, well over 50% of those admitted to the Jail have been in pretrial status, half charged with misdemeanor offenses and held in lieu of bond.[22] Detainees average 8

---

*Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974).

**21.** The court stated:
This Court measures the claims in this case by the standards utilized by the courts in such cases as *Rhem v. Malcolm*, 507 F.2d 333 (2nd Cir. 1974); *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Jones v. Wittenburg*, 323 F.Supp. 93 (D.C.) and 330 F.Supp. 707 (N.D.Ohio 1971); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971). The Court in *Rhem, supra*, put it succinctly and in precise terms:
"The demands of equal protection of the law and of due process prohibit depriving pre-trial detainees of rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners . . . a detainee is entitled to protection from cruel and unusual punishment as a matter of due process, and, where relevant, equal protection."
416 F.Supp. 100, 105.

**22.** The District Court found that the following rough breakdown applied to the 2868 prisoners admitted to the Jail during the 10-week period from mid-January to mid-April 1976:

New Admissions
(60% of total) ----------------------(1720)
Committed by courts
(80% of New Admissions) -------(1376)
Committed by courts in lieu of bond (90–95% of those committed by courts) ----------(1238–1307)
Committed by courts pursuant to sentence of incarceration (5–10% of those committed by courts) --------------------(69–138)

New Admissions (Cont'd)
Committed by Immigration and Naturalization Service, by U.S. Marshal, or on writs of habeas corpus
(20% of New Admissions) ----------(344)
Recommits
(40% of total) ----------------------(1147)
All recommits are sentenced and held at the Jail because of the administrative decisions and priorities of the Department of Corrections.

These figures are based on the approximate percentages given in the District Court's May 24, 1976 memorandum. *See* 416 F.Supp. at 112–13.

The District Court found that at the time of trial, the defendants held the following categories of sentenced inmates at the Jail:
a) all misdemeanants serving sentences;
b) sentenced inmates from District Court awaiting designation of a Federal Bureau of Prisons institution for service of sentence, or awaiting transportation to such Federal institution after designation;
c) sentenced inmates from Superior Court where designation to a Federal Bureau of Prisons institution has been recommended by the sentencing judge, pending action on that recommendation and transportation to the institution;
d) inmates within three months of their parole eligibility date at time of sentence;
e) inmates within six months of their release date at time of sentence;
f) inmates on work release charged with violation of their work release conditions, pending review by the Work Release Review Board;
g) inmates charged with parole violations, pending their preliminary parole revocation hearing;

to 12 weeks in the Jail awaiting trial. Those who are convicted average another 2 to 4 weeks between trial and sentencing. In August 1976, the District Court found that 20 percent of the unsentenced inmates had been there more than 4 months.[23]

Conditions at the D.C. Jail have changed considerably over the course of this 7-year litigation. At the time of trial in March 1975, members of plaintiffs' class were housed at the old Jail facility. The main structure, including Cellblocks 1 and 2, was built in 1872. Cellblocks 3 and 4 as well as an administrative building were added in 1929. In addition, the old Jail has two open dormitories, a 37-bed hospital, a library, a laundry, and a kitchen.

Individual cells are approximately 6 feet wide by 8 feet long by 9 feet high, and at the time of trial often housed two men. They contain an uncovered toilet, a sink, a small table and bench attached to the wall, and a single or bunk bed. Only cells in Cellblocks 3 and 4 have windows or hot water. The dormitories are large rooms approximately 40 by 98 feet, housing 125 to 150 men at the time of trial and containing four rows of beds. Each dormitory also has a toilet facility walled off from the main room but without partitions between commodes. Personal effects are kept under the beds.

At the time of trial, new arrivals were not being given security classifications, despite a Departmental Order requiring each superintendent to establish a program for doing so. D.O. 4090.1, dated November 9, 1973. Most new arrivals were assigned to Cellblocks 1 and 2, which were maximum security units. The District Court found

that because of this system, "many unsentenced inmates who do not require maximum security are housed in the maximum security areas of the Jail under the most stringent living conditions. Only a small percentage of Jail residents (estimated by the Superintendent of the Jail as approximately 125 inmates) require maximum security housing." 416 F.Supp. at 103. Cellblock 3 housed inmates assigned to the Captain's Detail, which performed many of the Jail's maintenance and culinary chores. Cellblock 4 housed juveniles and elderly persons.

Although clothing was and is issued to new arrivals, the District Court found laundry services to be "inadequate." Except for members of the Captain's Detail in Cellblock 3, inmates at the time of trial had to wash their own underclothing. Those without hot water often did this while taking showers. Moreover, detainees often were given "old mattresses, not cleaned or sterilized and stained with urine and other excreta." *Id.* at 104.

There was evidence at trial that the old Jail was constantly noisy from the start of the day at 5:30 a. m. until lights out at 10:00 or 11:00 p. m. This noise came from radios and televisions over which the inmates had no control, as well as from the prisoners themselves. The hard concrete and steel surfaces, and the arrangement of cells stacked four high, did little to deaden the din.

Plaintiffs also complained of the lack of adequate medical attention. Following a consent order on November 10, 1972 requiring the defendants to provide prompt medical care to all inmates needing it,[24] plain-

h) sentenced inmates for whom a court orders protection and/or separation from other inmates;
i) sentenced inmates whom the Department wishes to segregate from other residents at the Lorton Complex for protective reasons;
j) sentenced inmates assigned to the "Captain's Detail" (work crew) at the Jail;
k) inmates brought to the Jail pursuant to writs of habeas corpus *ad prosequendum* or *ad testificandum*;

*l*) inmates sentenced under the Youth Corrections Act to evaluations pursuant to 18 U.S.C. § 5010(e), after completion of the evaluation and pending final imposition of sentence.
416 F.Supp. at 102–03.

23. *See* note 31 *infra*.

24. This consent order, which was amended on January 11, 1972 and on April 17, 1974, also

tiffs periodically filed motions to show cause why the defendants should not be held in contempt for failing to comply with this order. These motions were supported by dozens of affidavits from prisoners alleging gross neglect of their serious medical problems.[25] Plaintiffs also offered uncontradicted evidence of serious infestations of rats, mice and cockroaches, as well as general uncleanliness causing obnoxious odors. By November 1975, however, the District Court found that "vermin have to a large degree been exterminated, some portions [of the Jail] have been painted, and apparently much cleaning has taken place because the horrible stench described at the trial was not in evidence during an unannounced visit in late August of this year. Also the delivery of medical services has improved because of additional personnel and a realignment of the authority of the medical staff." 416 F.Supp. at 104.

At the time of trial, most inmates at the Jail were allowed three half-hour social visits per week, conducted via telephone through plexiglass barriers, in addition to unlimited contact visits with their attorneys. Members of the Captain's Detail were granted three hour-long social visits, at which they could embrace and kiss their visitors upon meeting. The District Court found that the Captain's Detail inmates were afforded these and other privileges "to encourage inmates to apply for and work on the Detail." *Id.* at 103.

At the time of trial, inmates were granted two hours of outdoor recreation six days a week, except for those who were hospitalized, were working on the Detail, or were held in maximum security. Limited indoor recreation was also available to most inmates. Maximum security inmates at the old Jail were held in their cells on "deadlock" except for showers and "tier recreation" (30 minutes a day of walking on the corridor).

The brief foregoing description fails to convey the extent of degradation and discomfort imposed upon residents of the D.C. Jail, as revealed in the testimony of the many trial witnesses who visited the old facility. The flavor of their testimony appears in the statement of Robert Ardrey, a noted anthropologist and author, who described conditions there as "beyond the tolerable level of human existence" and "something that has been designed to produce monsters." Trial Tr. 445, 422. Dr. Karl Menninger stated that "everything done to a man committed to a place like the D.C. Jail appears to be done to make him suffer." Trial Tr. 249. Defendant Delbert Jackson, Director of the Department of Corrections, admitted that the Jail was "not really fit for human habitation."

Physical conditions improved for some inmates with the opening of the New Detention Facility (NDF) in April 1976. Each 7-feet-by-10-feet cell there is equipped with a bed, table, chair, toilet, and sink with hot and cold water, as well as a plexiglass window 24 inches by 42 inches. Each cellblock of 80 cells is air conditioned and has its own

provided that (1) defendants would not impede plaintiffs' counsel from conferring with them; (2) defendants would not retaliate against plaintiffs; (3) defendants would not use segregation cells except under emergency conditions and with an immediate hearing after notification of the inmate's attorney; (4) defendants would provide a bed and mattress to each inmate; (5) defendants would provide food on a uniform basis to all inmates except for medical reasons; (6) defendants would take steps to reduce the extremes of temperature in various parts of the Jail; and (7) defendants would immediately relay inmates' requests to see their attorneys.

**25.** The docket indicates that plaintiffs filed motions to show cause why defendants should not be held in contempt for violation of the consent order on April 27, 1972, on October 17, 1972, and on November 15, 1972. The first motion resulted in a hearing, for which the docket notes: "Finding: violations of order of January 11, 1972, by defendants." The second and third motions were denied by the District Court.

In addition, the trial transcript contains extensive testimony about the deficiencies of the Jail's medical services, including criticisms from the Jail's doctor and the Chairman of the Prison Health Committee of the D.C. Medical Society. Trial Tr. 776–809, 908–17. Several witnesses attributed these deficiencies to the administrative structure of the medical department. Trial Tr. 939–60.

indoor recreation area, two day rooms, and a separate dining area. The entire facility has two indoor recreation yards and a visiting room equipped with telephones and plexiglass barriers. The defendants have announced that all recreation at the new facility will occur indoors, and that no contact visits will be permitted except with attorneys. Maximum security inmates at the new Jail are subject to virtually the same regimen as at the old Jail, except that their indoor recreation takes place in a recreation room rather than on the tier corridor. Some type of classification system has also been instituted.[26]

Even with the NDF, the Department of Corrections has been forced to continue using parts of the old facility. In accordance with the Department's own plans, Cellblocks 1 and 2 were ordered closed by the District Court last summer because of severe deterioration, leaving Cellblocks 3 and 4 and two dormitories to house the overflow from the new facility. There is no indication in the record that policies or conditions at the old Jail have changed or will change significantly with the opening of the NDF, although plans have been made to renovate Cellblocks 3 and 4 if funds can be found.

**26.** *See* note 55 *infra.*

**27.** *See, e. g., Battle v. Anderson,* 564 F.2d 388 (10th Cir. 1977) (ordering defendants to reduce overcrowding in correctional facilities); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 398–99 (2d Cir. 1975) (ordering defendants to cease double-celling detainees, if necessary by releasing them); *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974) (ordering state Commissioner of Corrections to transfer detainees out of overcrowded county jail); *Costello v. Wainwright,* 397 F.Supp. 20 (M.D. Fla.1975) (ordering release of convicted prisoners to bring state prison system down to capacity levels), *aff'd,* 525 F.2d 1239 (5th Cir.), *remanded for 3-judge court,* 539 F.2d 547 (5th Cir. 1976) (en banc), *reversed and remanded on issue of 3-judge court,* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977), *on remand,* 553 F.2d 506 (5th Cir. 1977) (en banc) (panel opinion otherwise reinstated).

Like the District Court in this case, these and other courts have recognized that overcrowd-

## IV. OVERCROWDING

### A. *The Findings of the District Court*

■ The District Court stated that "[b]y far the most flagrant and shocking encroachment on the constitutional rights of the plaintiff class is the overcrowding . . . ." 416 F.Supp. at 105. There were four findings implicit in the court's conclusion.

First, the District Court found, on the basis of uncontested testimony, that overcrowding was likely to impair the mental and physical health of the detainees. In its Order of March 21, 1975, the court noted that "No attempt was made to rebut, or even cast doubt upon the accuracy of abundant testimony from credible witnesses that the overcrowding at the jail results in both physical and psychological damage to the inmates . . . ." Joint Appendix (J.A. at 100–01). The defendants have never challenged the substantive validity of this finding, and other courts have reached the same conclusion.[27] We see no reason to disturb it.

Second, the District Court found that this harm would not be alleviated unless each pretrial detainee was accorded at least 48 square feet of space.[28] This finding was

ing and double-celling are often prime causes of the tension, sexual assaults, denial of privacy, inadequate supervision and medical care, and the many other indignities and constitutional violations that characterize so many jails and prisons.

**28.** Paragraph 3 of the District Court's order of March 21, 1975, provided that "after 15 days from the date of this order defendants shall refrain from housing any pre-trial detainee of plaintiffs' class in any cell, room or dormitory where there is an average of less than 48 square feet per person." J.A. at 101–02. On April 4 we stayed paragraph 3 of the District Court's order "for the purpose of maintaining the *status quo* while the matter is under consideration . . . ." Oral arguments were held on April 25. Appellants alleged that it was "impossible to abate the violation in the brief period accorded them." Memorandum Opinion, May 2, 1975, at 2. On May 2, we continued in effect the temporary stay of April 4 ("modified however to make clear that appellants are obligated to continue to take steps toward compliance with the substance of the March 21, 1975 order"), and remanded the rec-

based upon substantial, uncontradicted testimony,[29] and the defendants have never challenged its substantive validity. We therefore affirm it.

Third, using the 48 square foot yardstick, the District Court found that the District Jail was substantially overcrowded. On March 21, 1975, the court found "that the District of Columbia Jail is overcrowded to the point where two human beings are compacted in areas which fall short of accepted minimal space requirements for occupancy by one person." J.A. at 100. At trial Anderson McGruder, Superintendent of Detention Services for the Department of Corrections, testified that the rated capacity of the Jail was 608, and that its present population was 976. The overflow was double-celled. Trial Tr. at 996–99. Although on May 16, 1975, the District of Columbia Department of Corrections filed a report with the District Court indicating that no member of the plaintiff class was housed in an area less than 48 square feet,[30] on August 7 the District Court found that "approximately 175–200 unsentenced individuals were being double-housed in cells measuring approximately six by eight feet." 416 F.Supp. at 107.[31]

The District Court was assured that defendants would be in compliance with the

ord "for further proceedings designed to clarify the central question of the feasibility of compliance . . . ." *Id.*

In a Memorandum Opinion dated November 5, 1975, the District Court rejected appellants' defense that compliance was infeasible. 416 F.Supp. 106. On December 23, appellees moved to vacate the April 4 stay. However, at oral arguments on January 12, 1976, appellants represented to this court that the Jail was presently in compliance with the March 21 order. Memorandum Opinion, Feb. 6, 1976, at 2. We therefore declined to vacate our stay (as modified by our May 2 order). We stated, however, that:

> If overcrowding should recur, notwithstanding the District's best efforts and representations in this court, plaintiffs may again seek vacation of the stay. At that time the parties should first proceed in District Court, and should address, and the District Court should make a record and specific findings on, the following issues:
>
> (1) the extent of overcrowding, (2) the District's attempt to avoid and to alleviate the overcrowding, (3) suggestions for what further actions the District should take, including the seeking out of alternative facilities, and (4) specifically, whether the jail's officials should be ordered not to accept new inmates.
>
> The proceeding can then be returned to this court for consideration whether to vacate or modify the stay.

29. The trial court heard uncontradicted testimony from Donald Conway, Director of Research at the American Institute of Architects, comparing this 48 square feet requirement with various groups' space requirements. The LEAA standard was 70 square feet per single-celled inmate, the U. S. Bureau of Prisons allotted 80 to 100 square feet, and the Army required 70 square feet for indefinite confinement or 55 square feet for confinement up to 14 days. Trial Tr. at 287–88. The Chief of Facilities Development for the Federal Bureau of Prisons testified that without 50 square feet of space for an inmate to move about in (excluding the space occupied by furniture), the cell cannot be considered safe, fit for habitation, or conducive to achieving penological objectives. *Id.* at 879–82. He also testified that more space would be needed in a detention facility than in a prison, assuming the detainees spent more time in their cells. *Id.* at 894. *See id.* at 113–14. At Cellblocks 1 and 2, cells were each 48 square feet. *See id.* at 1229. *See Williams v. Edwards*, 547 F.2d 1206, 1214–15 (5th Cir. 1977).

30. On April 25, the Department of Corrections had represented to this court that compliance with the 48 square foot requirement was "impossible." *See* note 28 *supra*. Delbert Jackson, Director of the Department, had testified before the District Court on April 1 that the Department had "reached the ultimate" in its efforts to comply with the March 21 order. 416 F.Supp. at 107.

31. At the same time, a "substantial number" of the sentenced prisoners were either housed alone in a 6-feet-by-8-feet cell or were housed in a dormitory where they had at least 48 square feet each. 416 F.Supp. 107. The defendants' May 16 report had promised that all unsentenced detainees would be given single-cell housing or 48 square feet of dormitory space ahead of any sentenced inmates.

On August 4, 1975, the total population of the Jail was 882. Of these, 584 were unsentenced, 225 were sentenced, and 43 were held on writs of habeas corpus or in connection with a pending appeal. Of the 584 unsentenced inmates, a study by the defendants revealed that 63% had been held at the Jail longer than 30 days and more than 20% had been held their longer than four months. 416 F.Supp. at 107.

48 square foot requirement by August 15,[32] and that defendants would provide notice to the court should the space requirement again be violated. 416 F.Supp. at 108. On October 14, the court was notified by defendants' counsel that the Jail was no longer in compliance with the space requirement, and had been out of compliance since September 16.

On January 12, 1976, appellants advised this court that they were presently in compliance with the space requirement.[33] However, on April 7, 1976, the District Court made an unannounced visit to the Jail, and at hearings on April 29–30 it found that "[d]uring most of the period from mid-January to mid-April, more than 200 persons at a time were held in violation of this Court's March 1975 order, most of them double-housed in the 136 one-man cells in Cell Block 2, in the oldest and most dilapidated part of the Jail." 416 F.Supp. at 112.[34] The defendants failed to provide "prompt notice" of this overcrowding to the District Court.

Faced with this substantial record, we have no difficulty in affirming the District Court's finding that the District of Columbia Jail has been seriously overcrowded.

Finally, to sustain the conclusion that the overcrowding of the Jail violated plaintiffs' constitutional rights, we must determine if this overcrowding can be justified by a compelling administrative necessity. On April 25, 1975, appellants represented to us that compliance with the District Court's space requirements was "impossible." We therefore remanded the record to the District Court "for further proceedings designed to clarify the central question of the

32. The court was advised that the Jail's capacity had been increased by two methods: "(a) the capacity had been recomputed to include lavatory and hallway space in some housing areas, so that although no physical changes had been made to the structure of the Jail, the Department now felt that a larger number of persons could be housed in the same space as before without violating their right to 48 square feet per man; (b) 'emergency funds' in excess of $10,000 had been made available by the Mayor's Office, which would enable the Jail to convert an area not previously used for housing to a dormitory." 416 F.Supp. at 108.

33. See note 28 supra.

34. The court made the following findings about the Jail's population:

During the aforementioned ten-week period, 2868 men were admitted to the Jail, approximately 60% categorized by the Department of Corrections as "New Admissions" and approximately 40% as "Recommits." The vast majority of New Admissions (approximately 80%), according to records of the Department, are persons committed to custody by the courts, either in lieu of bond while awaiting trial or pursuant to a sentence of incarceration. Approximately 90–95% of the New Admissions committed by the courts are committed in lieu of bond. . . .

Perhaps more significant is the fact that of those New Admissions who were received from the courts, 90–95% of whom (as previously stated) were in a pre-trial status, approximately half were persons charged with misdemeanor offenses, confined in lieu of bail. While the weekly summaries prepared by the Department of Corrections of admissions during this ten-week period include persons charged with robbery, homicide, burglary and other serious felonies, the number of persons committed as a result of charges for such relatively minor offenses as tampering with an auto, attempted petit larceny, destroying property, etc. is striking. Indeed, during the ten-week period studied, 140 individuals were committed for traffic offenses.

For those persons held at the Jail awaiting Superior Court trials, approximately twelve weeks intervene between initial arraignment and trial if the charge is a misdemeanor. If the defendant is charged with a felony, more than seven weeks will elapse between arrest and indictment, followed by eight to ten weeks before conviction, acquittal or dismissal, and an additional four weeks for sentencing for those who are convicted.

The "Recommit" category, the source of approximately 40% of the admissions to the Jail, are all sentenced individuals who are held at the Jail almost exclusively because of the administrative decisions and priorities of the Department of Corrections. (A small number in this class is held because of specific court order, usually founded on concern for the individual's safety if housed at the Lorton Correctional Complex.) No reasons, apart from the Department's and the City's funding priorities, exist to justify or require continued housing of most of these individuals at the Jail.

416 F.Supp. at 112–13. The court found that as of April 30, there were 1243 males housed in the Jail.

feasibility of compliance . . . ."[35] On November 5 and again on May 24, 1976, the District Court found not only that compliance was feasible, but that

> Apart from converting other space to a new dormitory at the Jail, the Department and the city have made *no substantial efforts to comply* with the Order of this Court since its issuance in March; and there is *no evidence of any contemplated effort* to either reduce the population at the Jail or to provide additional space. (Emphasis added.)

**35.** *See* notes 28 & 30, pp. ——–—— of 188 U.S.App.D.C., pp. 536–537 of 580 F.2d *supra.* We suggested possible avenues of compliance:

> [W]e contemplate that the Department and its counsel will seek the cooperation of the Chief Judges of the District Court and the Superior Court as well as the United States Attorney and the D.C. Bail Agency in an effort to explore ways to stem or divert the flow of new pretrial detainees into the jail and reduce the number of sentenced prisoners housed there. Furthermore, we presume that consultations with the designees of the Attorney General, who can e. g. expedite removal of Federal prisoners who have been sentenced, with the Mayor's Office, and other agencies of local and Federal government will permit consideration of other avenues for alleviating this temporary problem, and provide the type of cooperation necessary for a collective solution. The dimensions of the problem may require consideration of unusual remedies, perhaps even, e. g., modifications of unused barracks at service installations.

**36.** The court cited the following evidence of the defendants' lack of effort:

> At the August 7 hearing, Charles M. Rodgers, the Assistant Director of Operations of the Department of Corrections, and the man specifically charged by the Director with the responsibility for compliance with this Court's Order of March 21, admitted that although he was familiar with that Order and with the Order issued by the United States Court of Appeals on May 2, 1975, he had nevertheless made no efforts to consult with the Chief Judges of the two trial courts in this jurisdiction, nor with the District of Columbia Bail Agency, as contemplated by the order of the Court of Appeals. Similarly, although the Department's report filed with this Court on May 16 stated that the Department would convert recreation space at the Jail to afford additional housing, Mr. Rodgers admitted that he had no intent to do so, and

416 F.Supp. at 109.[36]

The defendants have repeatedly argued that overcrowding is the result of policies of other persons than themselves—judges, who commit pretrial detainees to the Jail; the U.S. Attorney, who bears responsibility for removing some sentenced offenders; and Congress, which must appropriate funds for new construction. However, the District Court found, and the history of this litigation clearly substantiates, that the defendants have not drawn upon their substantial powers and resources to influence the flow of pretrial detainees into the Jail,[37]

> had no such intent at the time the report was filed with the Court.
>
> As of August 7, no system had been established by the Department to determine whether or not the Jail was complying with the 48-square feet requirement; no consultation with the courts had been undertaken to attempt to expedite the sentencing of convicted individuals being held at the Jail awaiting sentencing; and, although this Court's Order applied only to pre-conviction detainees, no effort had been made to identify that class of persons as distinguished from those already convicted but awaiting sentencing.
>
> During the course of the August 7 hearing, at the suggestion of this Court's Deputy Clerk, a simple method of identifying the plaintiff class was suggested to officials of the Department. This "reform," which involved a minor change in the Superior Court and District Court Clerks' offices' method of processing commitment papers, was subsequently put into effect, and as of August 18, the Jail has been able to identify the plaintiff class.
>
> While some efforts were made by lower-level Department employees to reduce the population of the Jail, these efforts did not have a substantial impact on the crowding problem.

416 F.Supp. at 107–08.

**37.** In its November 5 memorandum, the District Court cited the substantial success of two previous efforts to obtain the release of pretrial detainees largely through the filing of bond review motions, but then criticized the City for failing to maintain these sporadic efforts on a regular basis. The Court also noted that the City had allowed the Bail Agency to become understaffed, thereby preventing it from monitoring the pretrial detainee population as required by 23 D.C.Code § 1303(h)(6). 416 F.Supp. at 109–10.

the movement of sentenced inmates out of the Jail,[38] and the development of additional housing space.[39] The court concluded that "the defendants have failed to take reasonable and obvious steps to alleviate overcrowding." 416 F.Supp. at 117. As for defendants' claim that they are bound by financial constraints, we join our sister Circuits in holding that while such considerations may be relevant, they can by no means be determinative. *See Battle v. Anderson,* 564 F.2d 388, 395–96, 400 (10th Cir. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 399 (2d Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333, 341–42 (2d Cir. 1974); *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 201 (8th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972).

On this detailed record we affirm the District Court's conclusion that overcrowding in the District Jail is not justified by any compelling administrative necessity. We therefore approve the court's holding that this overcrowding violated the constitutional rights of the plaintiff class.

### B. *The Question of Mootness*

The present posture of the case requires us to determine if events have mooted the justifications for the District Court's order. It is, of course, clear that "an action for an injunction does not become moot merely because the conduct complained of has terminated . . . ." *Allee v. Medrano,* 416 U.S. 802, 810, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974). "A case might become moot if subsequent events made it absolutely clear that the allegedly

---

**38.** According to the parties' stipulation, "Delbert C. Jackson, Director, District of Columbia Department of Corrections, has the authority to determine where a sentenced inmate will be held within the Department of Corrections, except in cases where a court specifically orders an inmate held in a specific institution."

In its November 5 memorandum, 416 F.Supp. at 106, the court cited several examples of the defendants' failure to expedite the transfer of sentenced inmates out of the Jail, including (1) their lack of a system for separating "unsentenced" inmates into "pretrial" and "convicted-but-unsentenced" categories ("there is no compelling reason why convicted felons must remain at the Jail pending sentence"); (2) their failure to ask the Attorney General to exercise his authority under 24 D.C.Code § 425 "to order the transfer of any [convicted prisoner committed to his custody] from one institution to another if, in his judgment, it shall . . . relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined"; and (3) their failure to urge the U.S. Marshal to move prisoners designated for other institutions in less time than three or four weeks.

In its May 24, 1976 Memorandum, 416 F.Supp. at 115–17, the District Court listed additional alternatives not pursued by the defendants, including (1) requesting Judge Gesell to modify the population limits he imposed on Lorton Youth Centers 1 and 2, so that persons who are sent there for diagnostic studies under 18 U.S.C. § 5010(e) may be kept there afterwards rather than being returned to the Jail; (2) requesting judges to authorize that persons whose § 5010(e) studies do not recommend Youth Act sentences be held at the Lorton Adult Facility pending imposition of sentence;

(3) housing sentenced misdemeanants at the under-capacity Minimum Security Facility at Lorton instead of at the Jail for serving of their sentences; (4) recommending that more misdemeanants serve their sentences in the Department's Community, Correctional Centers per 24 D.C.Code § 462; (5) following up on requests to the Parole Board and U.S. Marshal to remove parole violators held at the Jail; (6) seeking the consent of misdemeanants to allow their transfer from the Jail to the Maximum Security or Central Facilities at Lorton; (7) continuing to request judges to permit "weekend prisoners" to serve their time in halfway houses; and (8) ceasing to hold sentenced Superior Court felons at the Jail while awaiting the Bureau of Prisons' response to a recommendation for a federal prison assignment.

**39.** In its November 1975 and May 1976 memoranda, the court found that the Department had failed to use portable housing units available to the City and used successfully by other state prison systems. The court also noted that "no substantial efforts have been made by the Department to locate alternative housing facilities within the District of Columbia or at the Lorton Complex." In response to the defendants' contention that security could not be assured at such facilities, the Court recited that the former superintendent of the Jail had admitted that very few Jail inmates required maximum security. "[T]he notion that many of the sentenced misdemeanants, whose presence adds substantially to the overcrowding at the Jail, cannot safely be held in less secure facilities has never been satisfactorily explained by the Department." 416 F.Supp. at 117.

wrongful behavior could not reasonably be expected to recur," but the test is "a stringent one" and defendants carry a "heavy burden of persuasion." *United States v. Concentrated Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). *See Rabinowitz v. Board of Jr. College Dist. No. 508,* 507 F.2d 1255, 1256 (7th Cir. 1974). The decision whether defendants' illegal conduct is likely to recur lies in the equitable discretion of the District Court. "The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). *See Carter v. Gallagher,* 452 F.2d 315, 324 (8th Cir. 1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

■ In this case, the district judge offered the following observations after five years of litigation:

Notwithstanding the present crisis and the appalling prospects of a worsening situation, there has been no planning for dealing with this problem by the City or the Department. Rather, the tedious history of this litigation reflects only occasional and sporadic efforts, usually when a court proceeding has been scheduled, followed by almost total inactivity once the matter is no longer before the Court as a crisis situation. . . . [M]ore energy is devoted to pointing up excuses than to creative efforts to deal effectively with a problem which obviously is here and is not going away of its own accord—the new Jail notwithstanding.

This Court's skepticism concerning the Department's protestations of the impossibility of compliance urged on this Court and the Court of Appeals almost from the moment the original order of March 21, 1975 was entered, has been confirmed

and heightened by the events of the intervening year. Throughout these proceedings, when pressure was brought to bear, the impossible has become possible and compliance has been obtained, at least for a time. What has been missing, unfortunately, is a commitment to a long-range, continuing effort to maximize the resources presently available to the Department and the City, and to make plans to increase those resources to meet the need.

416 F.Supp. at 114–15. Given the history of defendants' grudging resistance, the ineffectiveness of their previous efforts at compliance, and the "flagrant and shocking" character of their past violations, the District Court was fully justified in concluding that this case was not moot. As the Supreme Court has stated:

When defendants are shown to have settled into a continuing practice . . . courts will not assume that it has been abandoned without clear proof. *Local 167 [of International Brotherhood of Teamsters] v. United States,* 291 U.S. 293, 298, 54 S.Ct. 396, 398, 78 L.Ed. 804. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption. Cf. *United States v. United States Steel Corp.,* 251 U.S. 417, 445, 40 S.Ct. 293, 297, 64 L.Ed. 343.

*United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952).

■ It is argued, however, that the opening of the NDF has so fundamentally altered the situation that the future likelihood of overcrowding "is conjectural at best" and equitable relief is therefore "hardly justified." [40] Brief for appellants at 23. The District Court considered this question in its April 1976 hearings. George Holland, Superintendent of Detention Services for the Department of Corrections, testified that there was a "strong possibility" that overcrowding would continue even af-

---

**40.** For a description of the NDF, *see* p. —— of 188 U.S.App.D.C., pp. 535–536 of 580 F.2d *supra.*

ter the opening of the New Detention Facility if "the rate of arrests and convictions continue." Tr. 29 Apr. 1976, at 75–76. Based on figures supplied by the defendants the District Court found that: (1) after Cellblocks 1 and 2 are closed, the old Jail can continue housing 376 inmates in Cellblocks 3 and 4, plus 201 more in dormitory areas if sufficient staff are available;[41] (2) the NDF can house 800 or 880 male inmates, depending upon whether one or two cellblocks are devoted to housing women from the overcrowded Women's Detention Facility; and (3) based on the underestimating of previous projections, far more than the 1300 inmates projected for spring 1977 would be held at the Jail by that time.[42] The District Court was thus led to "the unmistakable conclusion . . . that notwithstanding the opening of the NDF, the Jail facilities will continue to be overcrowded, and plaintiffs will continue to be housed in violation of their constitutional rights and elemental standards of human decency." 416 F.Supp. at 114.

We hold, therefore, that there is sufficient evidence in the record to sustain the District Court's conclusion that the opening of the NDF did not moot out this case.

C. *The Question of Remedy*

On May 24, 1976, the District Court issued a second order to alleviate overcrowding conditions. The court stated that "[a]ll efforts to induce the defendants to put their house in order have been unavailing up to now, and it is apparent that no meaningful effort can reasonably be expected absent a strong order of the Court which makes clear that housing inmates under unconstitutional conditions must cease." 416 F.Supp. at 117. The court thereupon enjoined defendants from housing after June 1, 1976 more than 577 persons at the old Jail (215 persons in Cellblock 4, 161 in Cellblock 3, 110 in Dormitory 1, and 91 in Dormitory 2). Further, since the defendants had stipulated that the New Detention Facility was "designed to house a maximum of 960 inmates," J.A. at 94, the court enjoined them from housing after June 1, 1976 more than 960 persons at the NDF.[43]

There is sufficient evidence in the record to sustain this injunction. The dissent simply distorts the record in the course of its animadversions concerning the lack of support for the District Court's finding of the capacity of the new Jail and the District Court's refusal to consider testimony as to the NDF's ultimate capacity. The reality is that the maximum capacity of the new Jail was set at 960 by the stipulation of defense counsel and by the testimony of defendants' own witness,[44] and the possibility of stretching that capacity through makeshift ar-

---

**41.** In its May 24, 1976 memorandum, the court stated: "[T]he prospects for sufficient staff to operate the Dormitory facilities are not good. If sufficient staff is unavailable, inmates will be crowded into Cell Blocks 3 and 4." 416 F.Supp. at 114.

The defendants have also proposed to renovate the 36-cell facility formerly used for alcoholics at Occoquan, although that work was still unscheduled as of the April 29 hearing.

**42.** Tr. 30 Apr. 1976, at 263–64. Leroy Anderson, Chief of the Office of Planning and Programming Analysis, testified that these projections were "consistently 29 per cent under actual." *Id.* at 262.

**43.** The order also provided that if overcrowding recurred, defendants were to release "those pre-trial detainees held in default of the lowest amount of bail, and among those detainees held in the same amount of bail those held for the longest time, until compliance with [the May 24] Order is obtained . . . ." Attached is the proviso that "if the Board of Judges of the Superior Court, or the Chief Judge thereof, specify a different method of selecting the persons to be released, the defendants shall be governed accordingly." 416 F.Supp. at 117. Chief Judge Greene of the Superior Court had already taken special steps to facilitate compliance with the District Court's March 1975 order. *See* Chief Judge Greene's Memorandum to the Judges, dated March 25, 1975, ordering expedited consideration of bail review motions.

**44.** George Holland, the Superintendent of Detention Services for the District, and defendants' own witness, testified that 960 was the maximum capacity of the new facility:

THE COURT: Now, when you run over capacity, you can't have them in the jail, can you? You can't have them in the new jail. As I gather it, you are situated so that when you get to 960, you have a full house.

rangements was omitted from consideration by the District Court *at the request* of defense counsel.[45]

We are aware, however, that the most recent evidence on this issue was received on April 30, 1976 before the full completion of the NDF. The District Court could now readily determine whether the harms projected over a year and a half ago have in fact materialized. We are also sensitive to the weighty local governmental interests involved. "It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies, may be affected by the public interest involved." *United States v. Morgan,* 307 U.S. 183, 194, 59 S.Ct. 795, 801, 83 L.Ed. 1211 (1939). *See Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

■ We therefore decline at this time to affirm the order of the District Court. Instead we remand the record to the District Court to determine if the anticipated overcrowding has in fact occurred. If the District Court finds that the defendants are in violation of the Constitution despite the full operation of the NDF, it may reissue its order. On the other hand, should the court determine that the District Jail is not overcrowded and that there is no likelihood of its being overcrowded in the near future, it may decline to issue relief.

> THE WITNESS: We have a full house. And when I get to approximately 400 or 500 in the old facility, I have a full house.
> At that point the question of what to do— where to put them is an unanswered question.
> THE COURT: You don't entertain any notion of putting them in that new facility, do you?
> THE WITNESS: Putting what in the new facility?
> THE COURT: Anybody beyond 960.
> THE WITNESS: No, sir. We don't. There would be no space.
> Tr. 29 Apr. 1976, at 94.

**45.** Defense counsel's restraint arose out of a concern that, although the capacity of the NDF could be increased substantially "[i]f we were pushed to the wall," if the maximum capacity was announced "certain . . . forces in

The protracted record in this case, however, amply demonstrates that defendants' compliance with the space requirements of the District Court's order in the past has been only intermittent. Although the Jail's population has grown steadily—from 700 in 1973, to 1380 in the spring of 1976—the Jail's population changes daily and fluctuates widely by seasons. The defendants have achieved compliance only sporadically and occasionally, "usually," as the District Court stated, "when a court proceeding has been scheduled." On August 7, 1975, for example, defendants advised the District Court that they would be in compliance by August 15, yet on October 16, the District Court was notified that defendants had been out of compliance since September 16. On January 12, 1976, defendants represented to this court that they were presently in compliance, yet on April 29–30 the District Court found that defendants had been seriously out of compliance from mid-January to mid-April.

Therefore, even if the District Court should determine on remand that defendants are presently in compliance, the court should also apprise itself of the likelihood of future infractions. If the District Court finds that there is a likelihood that the constitutional rights of the plaintiff class will be violated in the near future, the court should retain jurisdiction of the case to monitor the conditions at the Jail until it determines, in its sound discretion, that the likelihood of future violations has ceased.

this city which, if they learn about the maximum capacity figures with the old and new facilities combined, might very well try to push it over that as well." "Some people," defense counsel continued, "want to have more people committed to jail pretrial and what have you, and are just looking for an excuse to say, 'Well, they have the space now. Let's get them in there.'" Tr. 29 Apr. 1976, at 95. Defense counsel's observations led to the exchange cited by the dissent:

> THE COURT: You don't want to advertise the top figure no matter what it is.
> DEFENSE COUNSEL: Right.
> THE COURT: I am not interested in advertising it either . . .

Dissenting op. at ⸺ of 188 U.S.App.D.C., at 560 of 580 F.2d.

*See Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Newman v. Alabama,* 559 F.2d 283, 290 (5th Cir. 1977); *Reserve Mining Co. v. EPA,* 514 F.2d 492, 536–38 (8th Cir. 1975); *Gates v. Collier,* 501 F.2d 1291, 1321–22 (5th Cir. 1974). Such a procedure will relieve plaintiffs of the considerable burden and delay of initiating new proceedings.

To prevent any possible misunderstanding, we note that any disposition on this matter by the District Court will be appealable on the basis of the record and findings below.

## V. THE ORDER OF NOVEMBER 5, 1975

On November 5, 1975, the District Court issued an order concerning seven aspects of the administration of the Jail. 416 F.Supp. at 105–06. The order was addressed to policies of the District of Columbia Department of Corrections that are applicable to both the old and new jails. There is thus no question of mootness.[46] Defendants challenge paragraphs 2 through 7 of that order on appeal.[47]

### A. *Clean Clothing*

Paragraph 2 requires defendants to "[p]rovide clean clothing (including underwear) to all residents of the D.C. Jail and clean bed linen and towels at least once a week."

■ Defendants do not dispute that pretrial detainees are entitled to regular changes of clean clothes and linen. Instead, defendants oppose paragraph 2's linen requirement on the ground that they have "generally adhered to a policy of providing [bed linen and towels] on a weekly basis," and so "this aspect of the court's order presents no case or controversy affording a predicate for equitable relief." Brief for appellants at 39. However, the trial court heard uncontested testimony that inmates had not been provided with pillow cases until just before plaintiffs' expert witnesses toured the Jail; the linen was then not reissued after its collection for laundering. Trial Tr. 675–76. Thus, there is support in the record for the trial judge's determination that a court order covering linen is necessary despite the defendants' "general policy."

As for the remainder of paragraph 2, defendants do not dispute the necessity of providing inmates with a weekly change of outer garments, but they do oppose the order as it pertains to underclothes inasmuch as inmates can launder these small items in their cells. As long as inmates have access to hot water and detergent, we see no constitutional violation in defendants' contemplation that the inmates will arrange their own cleaning of underclothing.

### B. *Outdoor Recreation*

■ Paragraph 3 requires the defendants to "[p]rovide at least one hour of outdoor recreation daily for each resident of the Jail." [48]

---

**46.** We emphasize that the defendants in this lawsuit are, as the dissent recognizes, those persons "who administer the jail facilities that the government has provided for the District of Columbia . . . ." Dissenting op. at —— of 188 U.S.App.D.C., at 555 of 580 F.2d. The suit was not directed, as the dissent seems to imply, at the physical stones of the old Jail, *id.* at —— of 188 U.S.App.D.C., at 554 of 580 F.2d, but at the policies through which these defendants operated the Jail facilities.

**47.** The first paragraph of the order required various health and safety inspections per D.C. Code provisions and Jail regulations. This part of the order has already been carried out and is not challenged by defendants on appeal.

**48.** On February 6, 1976, we temporarily stayed paragraph 3 in its application to medical patients, work crew, and maximum security inmates. Finding the parties in agreement that paragraph 3 was not intended to cover the first two categories, we remanded the record for further examination of the feasibility of outdoor recreation for maximum security inmates. The District Court then held hearings on April 29 and 30, after which it issued the following conclusions:

1) No evidence was presented to the Court as to any dangers or risks involved in providing outside recreation to maximum security prisoners. In fact, at least two of defendants' agents testified that outside recreation for maximum security prisoners was possi-

We note, first, that although there was sufficient evidence before the District Court to sustain the conclusion that the absence of recreation would be likely to impair the mental or physical health of the pretrial detainees, *see, e. g.,* Trial Tr. at 225; *cf. Rhem v. Malcolm,* 371 F.Supp. 594, 611, 627 (S.D.N.Y.), *affirmed and remanded,* 507 F.2d 333 (2d Cir. 1974); there was no evidence about the necessity for *outdoor* recreation. The District Court may have had in mind the absence of indoor facilities at the old Jail for vigorous physical exercise. J.A. at 297–302. In that case, how-

ever, paragraph 3 ought to have been addressed to the *quality* of recreation defendants should be required to make available, rather than to its *location.* At the NDF, for example, indoor recreation facilities include a mini-gymnasium where inmates can play basketball and handball. 29 Apr. Tr. at 110. On the other hand, the District Court may have had in mind the salutary effects of exposure to fresh air and sunshine. Other courts seem to have come to this conclusion,[49] but there is insufficient evidence on this record to sustain it.[50] On

ble. George Holland, administrator of the new jail, testified that recreation for maximum security prisoners was not a security problem but a matter of developing the appropriate schedules.

2) Moreover there was no evidence presented which would indicate that defendants do not have the personnel or facilities to provide outdoor exercise to prisoners held in maximum security.

3) On the average there are 136 prisoners on deadlock at the District of Columbia Jail. Of that number Department of Corrections officials estimate that 60 to 65 percent are pre-trial prisoners, five to ten percent are convicted prisoners awaiting sentencing, and 25 to 35 percent are sentenced prisoners. Department of Corrections officials also estimate that 20 percent of the prisoners held in deadlock are there by court order, 70 percent are there for their own protection, five percent are there at the prosecuting attorney's request, and one to ten percent are there as a result of disciplinary procedures instituted by the jail officials.

4) On the average, pre-trial maximum security prisoners who are charged with felonies in Superior Court spend eight to ten weeks in jail prior to their trial, and an average of four weeks between conviction and sentencing. Prisoners charged with felonies and tried in District Court spend an average of eight to ten weeks between conviction and sentencing. Prisoners charged with misdemeanors and tried in Superior Court stay in jail an average of twelve weeks prior to trial and two weeks between conviction and sentencing. (These statistics are based on court records and are applicable to all prisoners.) The Department of Corrections is unable to determine how long sentenced prisoners remain in maximum security.

5) Prisoners in orientation at Lorton get outside recreation three times a day three days a week and twice a day two days a week.

6) Maximum security prisoners at Lorton receive one hour of outdoor exercise five days a week.

7) At the old Jail maximum security prisoners are not receiving any outdoor exercise.

8) Juveniles at the District of Columbia Jail now receive one hour of outdoor exercise daily. This new practice will continue to be the policy in the future.

9) The new jail has facilities for both indoor and outdoor exercise for all prisoners. Maximum security prisoners at the new jail are presently getting one-half hour of indoor exercise daily. The administrator of the new jail is presently developing recreation plans for the new jail and intends to give maximum security prisoners at that facility outdoor exercise.

416 F.Supp. at 118.

**49.** *See e. g., Miller v. Carson,* 563 F.2d 741, 749–51 (5th Cir. 1977); *Rhem v. Malcolm,* 371 F.Supp. 594, 627 (S.D.N.Y.), *affirmed and remanded,* 507 F.2d 333 (2d Cir. 1974); *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 677 (S.D.Tex.1975); *Sinclair v. Henderson,* 331 F.Supp. 1123, 1129–31 (E.D.La.1971); *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972).

**50.** The District Court also may have been relying upon an equal protection rationale. Convicted inmates at Lorton are provided outdoor recreation. *See* note 48 *supra.* Whether this difference constitutes a violation of equal protection, however, depends upon a careful analysis of the disparate functions and purposes of the two institutions, *see McGinnis v. Royster,* 410 U.S. 263, 270–73, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973), an analysis we cannot perform given the present state of the record. The District Court found only that:

The quality of life for members of the class is substantially inferior to that enjoyed by convicted prisoners housed at other facilities of the District of Columbia Department of Corrections. . . . The differences in treatment between sentenced prisoners at

remand, the District Court should determine the quality and kind of recreational opportunities that must be afforded members of the plaintiff class in order to protect their mental and physical health. This will depend upon what other recreational opportunities are available at a particular facility, and it may be affected by temporal factors such as the duration of a detainee's pretrial incarceration.

Second, we note that the record indicates that, with the exception of those inmates who were hospitalized, were working on the Captain's Detail, or were being held in maximum security, inmates of the old Jail received two hours of outdoor recreation six days a week. J.A. at 296–303. As the parties agree that paragraph 3 should not cover the first two categories, the order is overbroad as applied to the inmates of the old Jail, since violations were found only with respect to pretrial detainees held in maximum security.

The appellants now contend that since all pretrial maximum security inmates have been transferred to the NDF, paragraph 3 is moot. Supplemental memorandum of appellants, July 1, 1976, at 7–9. Unlike appellants, however, we read the District Court's order to apply to inmates of both the old and new jails. Recreation at the NDF does not comply with the standards of paragraph 3: Inmates at the NDF were scheduled to receive one hour of *indoor* recreation per day, while maximum security inmates at the NDF were to receive *one half* hour of indoor recreation per day. 29 Apr. Tr. at 103.

Appellants also contend that the recreational opportunities afforded pretrial detainees held in maximum security are merely a matter of the "classification process," and therefore immune from judicial scrutiny. Brief for appellants at 37. We reject this contention, and emphasize that a pretrial detainee is presumed innocent even if he is detained under maximum security conditions. The state cannot escape its caretaking responsibilities by means of administrative security classifications. Although the state may legitimately vary the conditions of confinement for maximum security inmates, it may not use security classifications as a license to harm pretrial detainees.

We therefore approve the finding of the District Court that the opportunity for some form of recreation is necessary to protect the mental and physical health of all pretrial detainees, and we remand the record for a determination of the quality, duration and location of this recreation.[51]

## C.   *A Classification System*

Paragraph 4 requires the defendants to "[e]stablish a classification system which will make it possible to determine a) which inmates of plaintiff class require maximum security confinement; and b) which members of [this] class can enjoy contact visits without jeopardizing the security of the facility." [52]   Virtually ignoring part (a) of

Lorton and pre-trial detainees at the Jail are not attributable to the needs of security or custody, but are for the most part due to the overcrowding at the Jail and the Department's decisions on the allocation of resources.
416 F.Supp. at 104. The court did not inquire, for example, whether the difference was attributable to the rehabilitative functions of the penitentiary at Lorton.

**51.** The quality, duration and location of recreation constitutionally required must of course be determined with reference to the administrative necessities of the Jail. The District Court determined that the provision of outdoor recreational opportunities for maximum security prisoners "was not a security problem," and that "there was no evidence presented which

would indicate that defendants do not have the personnel or facilities to provide outdoor exercise to prisoners held in maximum security." *See* note 48 *supra*. The court made no findings, however, about the administrative complexities surrounding the quality and duration of possible recreational opportunities, nor about whether administrative necessity prohibited the provision of outdoor recreation to prisoners not held in maximum security. On remand the court should clarify these issues.

**52.** After the District Court issued its November 1975 order, the defendants sought a stay from this court on the ground that plexiglass barriers were about to be installed in the visiting room of the new facility. On February 6, 1976, we denied defendants' motion, stating:

this paragraph,[53] the defendants argue to this court that a classification system for contact visits cannot be devised because the "temporary nature of a pretrial detainee's confinement at the D.C. Jail, in contrast to the more permanent nature of the committed inmate's confinement, simply does not logically lend itself to the classification of both inmate and his visitors, and takes on separate and distinct security considerations sufficient to accord greater administrative leeway." Brief for appellants at 33.

However, defendants' position is contradicted by their own actions and statements. On November 19, 1973, defendants issued Departmental Order 4090.1, requiring each superintendent to establish a classification system for determining the level of security needed for unsentenced residents of the Jail. And in a memorandum subsequently filed in this action, defendants stated: "there is presently a classification system whereby certain persons are designated for maximum security confinement for such reasons as danger to self or others, and a system whereby determinations are made as to which persons confined at the Jail may be accorded contact visits without jeopardizing security. The two, however, are not synonymous." [54] In light of this and other evidence,[55] we can hardly credit defendants' claims that a classification system for contact visits cannot be devised.

Reading the District Court's order as requiring not only a classification system but also contact visits themselves, the defendants further argue that such visits are not required by law and that various practical considerations prevent compliance. As we have noted previously, we do not interpret the District Court's order as mandating contact visits at this time.[56] Moreover, we interpret the District Court's order as permitting flexibility in determining which members of the plaintiff class can have contact visits without jeopardizing security. It may be that defendants will conclude that (a) there are (some) maximum security detainees who can have contact visits without jeopardizing security; or (b) that there are persons who present a substantial

---

Installation of plexiglass at the new jail does not violate the order as written. Should the order be extended to require contact visits at the new jail, the expenses associated with a later dismantling of the plexiglass system previously installed there could not rise to the level of irreparable injury.

Both parties indicated interest in early resolution of contact visits. If they join in a willingness to submit that issue on the merits, we will entertain a motion to sever that issue from the rest of the case and to handle the appeal on an expedited basis after the filing of supplemental briefs on that point. No such agreement among the parties was ever reached. Shortly thereafter, Chief Justice Burger stayed this paragraph pending final resolution of this issue by the Court of Appeals. Defendants then proceeded to install the plexiglass partitions at the new Jail.

Later, at the April 29, 1976 hearing, an official of the Department testified that the rotunda at the old Jail was too dilapidated to be repaired and that the visiting area of the old Jail would be moved "into the record section in the administrative wing of the old jail." Tr. 57. The Department's plans at that time called for installation of plexiglass barriers to prevent contact visiting.

**53.** The need for a classification system for maximum security designations is explained at pages — — – — of 188 U.S.App.D.C., at page 534 of 580 F.2d, supra.

**54.** The reference to contact visits here is somewhat ambiguous. Arguably, it refers only to the classification of inmates for the Captain's Detail. At trial, Anderson, McGruder, Superintendent of Detention Services, testified that contact visits were allowed for Captain's Detail prisoners as an inducement. He stated that with these inmates, the jail staff was willing to take a "calculated risk," but that he had made no attempt up until then to determine whether other inmates justified the same risk. Trial Tr. 1024–25(A).

**55.** At the April 29, 1976 hearing, a Department official testified that prior to being transferred to the new facility, inmates had already been given security classifications at the old Jail. Tr. 89. When asked the basis for these classifications and the selection of inmates to be transferred first, the witness replied: "We used a computer printout and looked at the offenses that the man had, and the time they had to serve. Medical condition was another thing we looked at and the emotional stability, and the general knowledge that the staff had of those men and the conditions that existed in terms of overcrowding." Tr. 67.

**56.** See note 52 supra.

threat in terms of contact visits even though they are not classified as "maximum security" detainees; or both. The classification system ultimately developed will involve the exercise of defendants' discretion, although this discretion will not be immune from judicial scrutiny if constitutional rights are violated. Should the classification scheme finally presented by the defendants preclude all contact visits, the District Court will have to determine if a total prohibition on such visits will be likely to impair the physical or mental health of the detainees, especially for extended periods of pretrial confinement.[57] If and when the District Court orders contact visits, we will be able to evaluate the particular strains placed on the jail administration by such an order in light of the presumed innocence of the pretrial detainees.

■■■ Accordingly, we affirm paragraph 4 insofar as it requires the defendants to devise a classification scheme for maximum security assignments and contact visits. Our affirmance permits the District Court to proceed with the fashioning of an order on the subject of contact visits, if it is so advised; such an order, of course, will be subject to later appeal.[58]

## D. Health Inspections of Food Handlers

Paragraph 5 requires the defendants to "[p]rovide medical examinations of all food handlers, inmate and civilian employees, at the Jail a least once every thirty (30) days and more often if medically required."

■■■ Although the trial record clearly substantiates that the kitchen *facility* at the old Jail has had many hygienic problems,

Trial Tr. 26–50, 514–21, 555, the foundation for this order concerning the kitchen *personnel* is not clear to us. To establish a constitutional violation, plaintiffs must first prove that defendants' failure to require monthly inspections has injured or is likely to impair the mental or physical health of the pretrial detainees. The trial record does not appear to show this. There is some indication, however, that paragraph 5 was not intended to remedy a constitutional violation, but was included in the November 5 order to force defendants to heed their own regulation, D.O. No. 4740.1, which requires medical examinations for food handlers twice a month. If so, we believe the trial court should have articulated the basis for jurisdiction and for enforcing the District's administrative regulations against itself. Assuming that the regulations have the force of law, and that pendent jurisdiction provides a basis for an order, it would still seem necessary to show that there had been violations or threatened violations as a predicate for injunctive relief. Accordingly, we remand the record for clarification of the factual and legal foundation for this paragraph.

## E. Transfer of Mentally Ill Inmates

■■■ Paragraph 6 requires the defendants to "[e]stablish the following procedures at the Jail: In the event an inmate at the Jail displays unusual behavior suggestive of possible mental illness, such behavior shall be immediately reported to the medical staff. The inmate will be seen by a psychiatrist within twenty-four (24) hours. If the inmate is found to be mentally ill, he will be transferred within forty-eight (48) hours of

---

**57.** Other courts that have considered the question have found the elemental human right of physical contact with one's family and friends—the embracing of a loved one, the holding of a child—to outweigh any unavoidable threat to institutional security. *See, e. g., Miller v. Carson*, 563 F.2d 741, 748–49 (5th Cir. 1977); *Rhem v. Malcolm*, 507 F.2d 333, 338–39 (2d Cir. 1974); 527 F.2d 1041, 1043 (2d Cir. 1975); *Detainees of Brooklyn House of Detention v. Malcolm*, 421 F.Supp. 832 (E.D.N.Y. 1976); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 690 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), *cert. denied sub*

nom. *Hall v. Inmates of Suffolk County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Jones v. Wittenberg*, 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom. *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972). *But see Feeley v. Sampson*, No. 76–1508, 570 F.2d 364 at 372–373 (1st Cir. 1978).

**58.** Because of our disposition of this aspect of the District Court's order, we deny appellees and appellants permission to file supplemental memoranda on the question of the necessity of contact visits.

such finding to a hospital having appropriate facilities for the care and treatment of the mentally ill." [59] This order rested on the following finding of fact:

Many inmates at the jail display psychiatric symptoms. Some of these, designated for pretrial mental examinations, are committed to the District of Columbia Jail to await bedspace at St. Elizabeths Hospital. Others require psychiatric attention after returning from St. Elizabeths upon completion of examinations. In addition, some inmates who are not the subject of mental examination orders become psychiatric problems. From time to time sixty to seventy percent of the hospital beds available at the Jail are given over to psychiatric patients. The Jail medical staff does not include a psychiatrist, and the facility is not equipped to house, care for or treat psychiatric patients. Ordinary handcuffs and leg irons are used to shackle some severely disturbed inmates to their beds because appropriate restraining devices are unavailable. (One inmate observed was reported to be commencing his third consecutive week under such restraint. [footnote by District Court])

416 F.Supp. at 104.

Defendants concede that "mentally ill inmates belong in a hospital facility and not in a jail." [60] Brief for appellants at 42.

The Health Services Coordinator for the Department of Corrections stated at trial: "It is felt by the Director of the Department of Corrections, by the Assistant Director and by me that we have no facilities of any kind to care for a psychiatric patient within the Department of Corrections." Trial Tr. 1104. Although he agreed that no person with mental problems should be housed at the D.C. Jail, he stated that the jail staff is forced to accept such persons anyway. Some are there by court order awaiting transfer to St. Elizabeths. Others are held there after being found competent for trial (though perhaps insane) at St. Elizabeths. Still others are under no court order, but are identified as possibly mentally ill by the jail staff. These inmates are referred for diagnosis and treatment, but because this process involves long delays and the Jail has no staff psychiatrist, severe problems arise.

As many courts have recognized, "An individual incarcerated . . . becomes both vulnerable *and* dependent upon the state to provide certain simple and basic human needs. . . . [W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972), *cited with approval* in *Estelle v. Gamble*, 429 U.S. 97, 105 n.11, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See also Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976); *Runnels v. Rosendale*, 499 F.2d 733 (9th Cir. 1974); *Dillard v. Pitchess*, 399 F.Supp. 1225 (C.D. Cal.1975); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass. 1973), *aff'd*, 494 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall v. Inmates of Suffolk*

---

**59.** On December 23, 1975, the District Court modified paragraph 6 to make clear that transfer of *sentenced* inmates to the hospital must meet the requirements of D.C.Code § 24–302. The court added the following notation:

Defendants shall comply with the requirements of 24 D.C.Code § 302, as modified by *Matthews v. Hardy*, 137 U.S.App.D.C. 39, 420 F.2d 607, in effecting the involuntary transfer of a sentenced prisoner under this paragraph. After the Court of Appeals refused to stay this paragraph, Chief Justice Burger temporarily stayed it pending completion of this appeal.

**60.** At trial, plaintiffs' counsel read from the medical records of two inmates who had committed suicide at the Jail. One was charged with a traffic violation and was being held at the Jail in protective custody until space was available at St. Elizabeths. After waiting three days for transfer, he hanged himself. The other was recommended for immediate transfer to St. Elizabeths. Seven days later he was still at the Jail and hanged himself. Counsel indicated that these were only two examples of inmates known to have psychiatric disorders who had committed suicide. *See* Trial Tr. 982–88. In addition, excerpts from inmates' medical records were read at trial, indicating that seriously disturbed detainees are regularly held at the Jail for weeks before and/or after their examination at St. Elizabeths. Trial Tr. 904–07, 1037–41. *See also* Trial Tr. 933–39.

*County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).

Without challenging this underlying legal principle, defendants initially argued that the 48-hour requirement is too inflexible [61] and that compliance is impossible. They contended that "the only such facility currently available is St. Elizabeths Hospital [to which] District officials can transfer no inmates . . . without the advance authorization of the United States." Brief for appellants at 42. More recently, however, defendants have informed us of the construction "on the grounds of the District of Columbia General Hospital [of] a 30-bed psychiatric facility which, it is hoped, will 'relieve * * * the backlog of those cases awaiting transfer to St. Elizabeths Hospital.'" Supplemental memorandum of appellants, July 1, 1976, at 3. If at some point this new facility should prove generally inadequate for complying with the District Court's order, the defendants should seek review of that order in the lower court at that time. In such event, we would expect the District Court to make specific findings addressed to the feasibility of transferring mentally ill detainees to government or private hospitals, or of providing suitable care at the Jail by the development of services presently unavailable, as a predicate to reaffirming or modifying its general transfer plan. We stress that although defendants' asserted lack of authority to transfer inmates to St. Elizabeths may bear on their ability to provide outside hospital care within 48 hours, it cannot excuse defendants from their obligations to attend promptly and appropriately to the medical needs of detainees whose incarceration prevents them from finding their own treatment. It is also conceivable that isolated situations may arise where transfer within 48 hours is not feasible or where a detainee found to be mentally ill may not be in immediate need of hospital treatment. Allowing for such exceptional cases, we modify paragraph 6 to require defendants to submit a written report to the District Court whenever they have special cause to deviate from that order as now written. Such report should give the reasons for deviation and the exact time within which compliance will be achieved; a second report should then be submitted when transfer has actually been effected.[62]

### F. *Restraints*

Paragraph 7 requires defendants to "[e]stablish the following procedures governing use of restraints:

a) inmates requiring restraints will be housed only on the third floor Jail Hospital, or at D.C. General Hospital;

b) unpadded handcuffs and leg irons shall not be used under any circumstances. Medically appropriate restraints, pad-

---

**61.** Defendants do not oppose the requirement that an apparently ill patient be seen by a psychiatrist within 24 hours; they object only to the 48-hour transfer requirement.

**62.** Defendants also argue that transfer of a prisoner from one place of detention to another falls "within the traditional core of habeas corpus," and therefore "any related relief must at least be initially sought on the local judicial level as an essential prerequisite to the exercise of federal jurisdiction . . . [under] D.C. Code, 1973 § 11–921(a)(3)(A)(iii), and § 16–1901." Brief for appellants at 24–25. Defendants rely on *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), which holds that claims going to the fact or duration of imprisonment, as opposed to the conditions of imprisonment, have as their sole federal remedy habeas corpus with its attendant requirement of exhaustion of state remedies. Defendants also cite cases from the Fifth Circuit holding that habeas lies when prisoners seek transfer from places of more punitive to less punitive conditions of confinement (*e. g.*, from solitary confinement to general incarceration) because this transfer goes to "the very fact or duration of his physical imprisonment." *see, e. g., Krist v. Ricketts*, 504 F.2d 887 (5th Cir. 1974). Whatever our views on the type of transfers addressed by the Fifth Circuit, we believe that transfers to a nonpunishment mental health unit of the D.C. correctional system involve "conditions of confinement" rather than "[the very] fact or duration of . . . physical imprisonment," and thus do not come *solely* within the category of habeas corpus, although habeas may afford alternative relief for inmates challenging this condition of their confinement. *See* 411 U.S. at 499, 93 S.Ct. 1827. Accordingly, exhaustion of remedies in Superior Court is not required as a prerequisite to federal relief.

ded or pliable to prevent injury to the inmate, may be utilized;

c) restraints may be imposed only on the specific written authorization of a medical doctor;

d) if required in an emergency situation when a doctor is not at the Jail, a Medical Technical Assistant (MTA) or a Registered Nurse may order the temporary use of restraints, subject to the receipt, by telephone or otherwise, of approval from a medical doctor within two (2) hours of the imposition of such restraints;

e) a log will be kept reflecting the use of restraints, and stating for each such use the name of the person restrained, the date and time he was placed in restraints, the name of the doctor approving the use of restraints, and the time of such approval;

f) orders by a doctor authorizing the use of restraints are valid for twenty-four (24) hours only, and if no further written order has been entered within that period, the inmate shall be released from restraints;

g) no restrained inmate shall be housed in such a manner as to permit access to him by non-restrained inmates, with the exception of inmates approved by the medical staff for employment in the hospital area."

(The order as it appears at 416 F.Supp. 106 does not reflect the wording of the order as it appears on the Docket of the District Court.) Although paragraph 7 is not explicit, we construe it to apply only to the restraint of those pretrial detainees displaying unusual behavior suggestive of possible mental illness.

Defendants essentially concede that such extraordinary restraints on the liberty of pretrial detainees require special and continuing justification of a medical nature, and must be carefully supervised so that they become neither unnecessary nor harmful. Defendants' position is that they already follow these procedures in most respects. In a nutshell, their argument is that "in the absence of any proof establish-

ing abusive or arbitrary practices by appellants as to the use of restraints, it is submitted that the court below has . . . unwarrantedly ursurped [sic] the prison management function. . . ." Brief for appellants at 46. However, as noted in the preceding section, the District Court specifically found that "[o]rdinary handcuffs and leg irons are used to shackle some severely disturbed inmates to their beds because appropriate restraining devices are unavailable," and personally observed one inmate commencing his third consecutive week under such restraint. See also Trial Tr. 753. According to testimony at trial, restraints are not supposed to be used without a doctor's authorization, Trial Tr. 1144-45, but this rule applies only to inmates restrained in the Jail hospital. No evidence was offered indicating that present restraint procedures include the log requirements or time restraints of the District Court's order. Hence, apart from defendants' assertions on appeal, we have no basis to conclude that the lower court's findings are clearly erroneous or that its order is superfluous.

We do note, however, that the order as written is deficient in several minor respects. First, it refers only to the old Jail; second, it fails to allow for the temporary restraint of an inmate until a doctor, MTA or nurse can be summoned. In affirming paragraph 7, we do not foreclose modifications by the District Court to cover these omissions.

## V. CONCLUSION

The life of pretrial detainees at the District of Columbia Jail has been marked by deprivation, neglect and degradation. Contrary to the repeated assertions of the dissent, the opening of the New Detention Facility does not moot the case, for the danger of future violations continues to exist, and, in any event, many of plaintiffs' claims arise from the defendants' continuing policies.

Addressing the more egregious hardships imposed on plaintiffs, the District Court's various findings and orders as affirmed assure to each detainee a right to minimum

space of his own, a regular change of linen and outer clothing, daily recreation, a rational security classification to prevent excessively harsh confinement and possibly to prepare the way for contact visits, prompt psychiatric care, and carefully regulated use of restraints. These provisions are so essential to decent custodial care and so clearly justified by the 6-year history of this litigation that we cannot conceive how they could ever be considered unwarranted intrusions into the prerogatives of local government—unless those prerogatives translate into total immunity from federal judicial review.

The constitutional standard we have announced today requires the District Court to evaluate the requirements of jail administration. We see no alternative if the rights of pretrial detainees are to be respected. Nevertheless, we are keenly aware of the wisdom of Justice Powell's advice that "courts are ill equipped to deal with the increasingly urgent problems of prison administration . . . ." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Black-

stone observed centuries ago that "what [is] requisite must . . . often be left to the discretion of the jailors." Blackstone went on, however, to complain that jailors "are frequently a merciless race of men, and, by being conversant in scenes of misery, steeled against any tender sensation." 4 W. Blackstone, Commentaries * 300. We deeply hope that the intervening years have disproved the causes of Blackstone's complaint,[63] for ultimately it is only with the whole-hearted cooperation of jail administrators that the constitutional rights of pretrial detainees can be protected. That cooperation would be most meaningfully expressed if the defendants in this case were to promulgate rules or regulations incorporating the constitutional standards we have enunciated and creating regular procedures whereby pretrial detainees can complain on the record of alleged infringements of their constitutional rights.[64] In this way the defendants can in the first instance bring their own considerable expertise to bear. Not only will such procedures obviate in a great number of instances the necessity of involving the federal judiciary,[65] but if re-

63. We must with some sadness, however, note the conclusion of a recent decision which, after surveying the "legion" of recent cases concerned with the conditions of pretrial detention, observed that conditions were "barbaric": "[W]e cannot escape awareness that conditions in many pretrial detention centers have shocked the conscience of courts across the nation." *Pugh v. Rainwater*, 557 F.2d 1189, 1191–93 & n. 6 (5th Cir.), *petition for reconsideration en banc granted*, 562 F.2d 362 (5th Cir. 1977).

64. As Chief Justice Burger has observed in a speech to the National Conference of Christians and Jews (Nov. 16, 1972):

This, in essence, is what every penal institution must have—the means of having complaints reach decision-making sources through established channels so that the valid grievances can be remedied and spurious grievances exposed.

*quoted in* J. Keating, Jr., V. McArthur, M. Lewis, K. Sebelius, and L. Singer, Grievance Mechanisms in Correctional Institutions 4 (Law Enforcement Assistance Administration 1975). The tentative draft of the ABA's Criminal Justice Section Project on Standards Relating to the Legal Status of Prisoners states unambiguously that "Prisoners should be guaranteed effective exercise of the right to petition for re-

dress of grievances." *See* 14 Am.Crim.L.Rev. at 569–89 (1977). For a survey of grievance procedures presently in operation, *see* Comptroller General of the United States, Grievance Mechanisms in State Correctional Institutions and Large-City Jails, June 17, 1977 (B–171019).

65. A recent study of the ward grievance procedures at the California Youth Authority found that, of a total of 1,496 grievances filed between September 1973 and April 1975, "only 28 grievances, 2 percent of the total, needed outside arbitration to produce a settlement." National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, Controlled Confrontation: The Ward Grievance Procedure of the California Youth Authority 5, 11 (1976). *See* Keating, *The Justice Model Applied: A New Way to Handle the Complaints of California Youth Authority Awards*, 10 Loy.L.A.L.Rev. 126, 147 (1976):

As of early 1976, the percentage of cases appealed to outside review had fallen to one percent. The type of issue submitted to arbitration has varied widely, running from a dispute over medical care provided to an individual grievant to one ward's claim of a constitutional right to display politically unpopular paraphernalia in his room. As of

sort to a federal court is required the administrative record produced will "assist in the disposition of any resulting litigation." *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 371 n. 22, 373 F.2d 451, 456 n. 22 (1966). *See Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 327, 427 F.2d 589, 597 (1970). Furthermore, such procedures will enable jail administrators to "correct their own mistakes, thereby minimizing the number of times they must defend, in court, a decision they really do not support." Bazelon, *The Impact of the Courts on Public Administration*, 52 Ind.L.J. 101, 105 (1976).[66] The cumulative effect of such procedures will be to lead the Department of Corrections carefully and self-consciously to consider the constitutionality of the conditions of confinement at the District of Columbia Jail.[67]

The record is remanded for clarification of paragraph 5 and further consideration of paragraphs 3 and 4 of the November 5, 1975, order. We continue our stay of the District Court's order of March 21, 1975 and stay its second order of May 24, 1976, and we remand the record for further consideration of appropriate relief. Except as modified in the foregoing opinion, the orders of the District Court are otherwise affirmed,

and the temporary stays of this court are vacated.

*So ordered.*

MacKINNON, Circuit Judge, dissenting in part and concurring in part:

In 1969 the Congress responded to requests from the District of Columbia and made the first appropriation for the survey which was required as the first step leading to the replacement and improvement of the old D.C. Jail facilities through the building of a new jail primarily for the housing of pretrial detainees.[1] Some time thereafter in 1971, while the planning and design of the new jail to rectify housing conditions was in progress, several pretrial detainees at the old D.C. Jail brought this action.

## I. THE COMPLAINT

Their complaint, filed July 21, 1971, sought (1) a declaratory judgment that the constitutional rights of the pretrial detainee plaintiffs were being violated by the "conditions" of their confinement in the "District of Columbia Jail" and (2) a permanent injunction against the responsible District of Columbia officials[2] from continuing to vio-

---

March 1, 1976, not a single disposition of a grievance under the procedure had been taken to either a state or federal court. (Footnotes omitted.)

**66.** For example, a study of the ward grievance procedures of the California Youth Authority found that "in 69.2 percent of grievances submitted, the relief requested by the grievant was granted in whole or in part." Keating, *supra* note 65, at 147. *See* M. Keating, Jr., Improved Grievance Procedures: A Technical Assistance Manual 245 (Center for Community Justice 1976).

Grievance procedures will also help to defuse the potential for violence within the jail. *See, e. g.* National Advisory Commission on Criminal Justice Standards and Goals 57 (1973):

A formal procedure to insure that offenders' grievances are fairly resolved should alleviate much of the existing tension within institutions. . . . Peaceful avenues for redress of grievances are a prerequisite if violent means are to be avoided. Thus all correctional agencies have not only a responsibility but an institutional interest in maintaining procedures that are, and appear to offenders to be, designed to resolve their complaints fairly.

**67.** As one authority on prison grievance procedures has put it, "There are . . . administrative payoffs in a properly functioning grievance mechanism. It is an ideal means of bringing clarity and rationality to policies which, under the scrutiny of a grievance mechanism, must daily be explained, justified, eliminated, modified, or replaced. 'Customs' and 'traditions' are exposed as such and can be either eliminated or made into evenly enforced policy." J. Keating, Prison Grievance Mechanisms: A Manual 18 (The Center for Community Justice 1977).

**1.** S.Rep. No. 559 on H.R. 14916, 91st Cong., 1st Sess., December 3, 1969, p. 49 in the "Capital Outlay" appropriations of the District of Columbia Appropriations Bill there was included "$150,000 in survey funds for a new jail . . ."

**2.** Defendants were (1) the Superintendent of the D.C. Jail, (2) the Director, D.C. Department of Corrections and (3) the Mayor and Commissioners of the District of Columbia. All were sued individually and in their official capacity (Par. 6, 7, 8).

late plaintiffs' alleged constitutional rights (Par. 1). Plaintiffs also assert that they are representative of a class of "unconvicted pretrial detainees incarcerated at the District of Columbia Jail . . . [and] pretrial detainees who will be incarcerated at the D.C. jail in the future" (Par. 5). The "jail" referred to was the only jail then in existence—but now the new jail has been built and is in use and the use of the oldest half of the old jail, Cellblocks 1 and 2, has been discontinued.

This litigation was directed at the old jail, as were practically all of the hearings thereon. Since then the situation has changed very substantially by the completion of the new jail with minimum capacity for 960 inmates in air conditioned comfort. Thus the situation complained of by appellants has practically disappeared and no complaint has been directed against the present facilities. The case is thus moot for all practical purposes and should be dismissed. Instead, however, the majority seek to gnaw on an old bone.

The majority opinion contends that the case is not moot—arguing:

> The [District Court] order was addressed to policies of the District of Columbia Department of Corrections that are applicable to both the old and *new jails*. There is thus no question of mootness. (Maj. op., p. —— of 188 U.S.App.D.C., p. 544 of 580 F.2d, emphasis added)
> The suit was not directed . . . at the physical stones of the old Jail . . . but at the policies through which [the] defendants operated the Jail facilities. (Extract from n. 46, Maj. op.)

The court's assertion is facially fallacious. Merely addressing an order to policies at a jail that was not the subject of the litigation, and concerning which *no adequate record has been made as to its policies*, is an insufficient base to support the court's order. The lawsuit did not involve the new jail and the testimony of record as to the *old jail* is insufficient to support the court's order insofar as the *new jail* is concerned. While the same people administer and operate the new jail as did the old one (Maj. op.,

fn. 46), this is fundamentally irrelevant since with the opening of the new jail the factual circumstances on which the District Court relied, no longer exist. It is a gross distortion of the jurisdiction conferred on the court by the lawsuit to attempt to expand the court's jurisdiction to include the new jail by ignoring the uncontroverted fact that the complaint was addressed only to conditions at the old jail and that the *policies* of the defendants that were the subject of controversy were inextricably intertwined and practically controlled by the structural limitations of the physical features of those facilities. Stone walls may not a prison make, but when a prison does have stone walls it is rather difficult to overcome their restrictive effect—even by a court order.

The complaint also alleges, *inter alia*, that plaintiffs are incarcerated solely because they are unable to post bond, that they are presumed innocent, that they are incarcerated solely to ensure their presence at trial and that the "physical conditions of [their] confinement constitute unconstitutional punishment" because they are "overcrowded" in cells that violate "minimal architectural standards and the jail is overcrowded and its heating, ventilation and other aspects of the physical condition . . . constitute a health threat" (Par. 10). Plaintiffs also complain of inadequate food, recreation facilities, programs and contact with the general community. Included in the latter allegation is an objection to censorship of mail, limitation on visitors, lack of access to telephones, newspapers and other means of communications which it is asserted violate their "First, Fifth, Eighth and Fourteenth Amendment rights." Hospital and medical services are alleged to be inadequate as are the "security measures," *i. e.*, protection from other prisoners. Through the foregoing allegations, and by others, plaintiffs assert practically all the possible prisoner complaints, including the charge that each complaint constituted a constitutional violation.

Finally, it is alleged that all these conditions of confinement are additionally uncon-

stitutional, because they are more severe than post-sentence *punishment* that plaintiffs might receive at other correctional institutions to which they might be sent (this includes Lorton Reformatory also administered by the District of Columbia), and that as "pretrial detainees" they should not be subjected to such confinement because they are awaiting trial and presumed innocent (Par. 15).

Their prayer for relief seeks a determination that their constitutional rights have been violated, that a permanent injunction issue against a continuation of such practices and omissions and that the D.C. authorities be required to submit a plan as a future guarantee against continuation of the alleged practices and conditions so complained of. Specifically demanded, among other relief, was the establishment of "a regular recreational . . . program," "an educational . . . vocational . . and voluntary work program," "that prisoners have continuous opportunity to talk and associate with each other," "that prisoners have access to a sufficient quantity and quality of books, magazines, and newspapers, law books and legal materials," [3] "that visiting conditions . . . ensure . . privacy of conversations, conjugal rights, and additional visiting periods," and "that no limitations be placed on persons an inmate may see, communicate with, and receive communications from."

Hearings before the trial court were conducted from March 4 to March 13, 1975 and covered 1372 pages of record testimony all dealing with *operations* at the old jail. A great many of appellants' demands were denied, by the trial court, for obvious reasons, but some were granted. The majority opinion affirms the District Court in part but remands the record in material respects.

## II. THE SUBJECT MATTER OF THE LITIGATION

From the allegations of the complaint it is obvious that "conditions" in the old jail were the subject matter of plaintiffs' complaint. The suit was filed in July 1971 and that was the detention facility then being used by the District of Columbia and it was the situs of plaintiffs' incarceration. The hearings before the trial judge were also directed to "conditions" at that jail. Some of its principal features are described in the majority opinion.

## III. THE APPEAL

The District of Columbia defendants, who administer the jail facilities that the government has provided for the District of Columbia, appeal from the orders of the District Court of (1) March 21, 1975, (2) November 5, 1975, and (3) May 24, 1976. In response to appellants' contentions the majority opinion concludes:

1. The jail conditions which the District Court finds objectionable serve no legitimate purpose of detention.

2. The opening of the New Detention Facility does not moot the case.

3. Each pretrial detainee is entitled to (a) a cell with a minimum of 48 square feet, (b) a regular change of linen and outer clothing, (c) some form of recreation each day, (d) a security classification to prevent harsh confinement and possibly to prepare the way for contact visits, (e) prompt psychiatric care, (f) court regulated use of restraints. (Maj. op., p. —— of 188 U.S.App.D.C., pp. 551–552 of 580 F.2d).

---

**3.** *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), holds that *prison* authorities in a correctional institution must provide prisoners with access to law libraries or adequate assistance from persons trained in the law in order to guarantee their constitutional rights of "access to the courts." *Accord, Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), *aff'g, Gilmore v. Lynch*, 319 F.Supp. 105 (N.D.Cal.1970). While there are substantial differences between the legal status of prisoners in a jail and those in a correctional institution that might lead to less of a demand for law libraries in jails, the demand for law libraries by pretrial detainees, being based on their right of "access to the courts," is answered insofar as the D.C. Jail is concerned by the availability in all cases of adequate assistance from persons trained in law.

4. The record is remanded for the District Court to consider whether the new jail, up to this point not the subject of this lawsuit, is overcrowded, and, if so, to order relief which may include the release of inmates from the jail.

As stated above, this lawsuit, started in 1971, was directed at conditions in the old jail. All the hearings before the trial court were directed at operation of the old jail and following completion of the original hearings the court order of March 21, 1975 was directed to operating conditions at the old jail. The principal complaint was directed against conditions in Cellblocks 1 and 2 which had been built in 1872. Cellblocks 3 and 4, completed in 1929, were in a different category.

All the time this lawsuit was pending, and for *at least a year and a half before it was started*, the D.C. authorities were attempting to correct the conditions here complained of by taking the necessary steps to obtain the erection of a new modern jail—adjacent to the old facilities. The new jail, with normal capacity for 960 inmates, was originally scheduled to be completed in January 1976 (Tr. Apr. 29, 1976, p. 158). Defendants in some of their representations to the court relied on this scheduled completion date. When the builders did not meet the anticipated date, the defendants were unable to comply *on schedule* with their plans for improving the conditions of incarceration by the scheduled transfer of upwards of a thousand prisoners and the closing of cellblocks 1 and 2. This delay led to some wrangling with the plaintiffs and the court. The delay in completion of the new jail was due to the contractors and their work force and was beyond the control of defendants, It is unseemly to take defendants to task for these delays in the construction schedule and I dissent from the apparent finding that defendants were guilty of "illegal conduct." Maj. op., p. —— of 188 U.S.App.D.C., p. 541 of 580 F.2d.

The overcrowding of the old jail was not the primary fault of defendants. It was caused by the frequency of the apprehension of offenders by police and by the actions and orders of prosecutors, jurors, judges (including federal judges) and the Congress—all unpredictable and uncontrollable by defendants. Thus, while the defendants administered the jail they did not control its population. In this respect they were the handmaidens of the judges, magistrates and law enforcement personnel, police, FBI, Secret Service and the United States Attorney. Pretrial detainees were confined in the jail pursuant to arrest warrants and other court orders. Thus, much of the criticism directed at the defendant D.C. authorities over the excessive jail population was directed at people whose responsibility for causing that situation was very minimal if it existed at all. In the last analysis it was Congress that was required to appropriate the necessary money and the size of the appropriation it provided determined the size and capacity of the new jail. If present facilities are inadequate it is Congress that must eventually take action to correct the situation. The strident tones directed at the D.C. defendants should be softened because of their limited responsibility and their limited ability to rectify the situation. Whipping them in public does not get the job done. The defects in the proposals suggested by the District Court, discussed on pages 20–23 *infra,* are self-evident proof that something more may eventually be needed if the problem escalates.

## IV. THE COURT HEARINGS

On the plaintiffs' complaint extensive hearings were held covering the operational facts at the old jail. On March 21, 1975, the court filed a memorandum and order declaring plaintiffs' constitutional rights were being violated and directed defendants to comply with all aspects of the order no later than fifteen days from that date. Such time limit obviously did not address itself to practical realities.

Thereafter a hearing was held on April 29 and 30, 1976 primarily on the issue of possible current overcrowding. During this hearing a few references were made to the situation that was developing with the completion of the new jail.

At that time some inmates in the old jail were being transferred to the new jail (Tr. April 29, 1976, 8) but transfers to the full capacity of the new jail were not completed until after its official completion date of August 10, 1976 (Tr. Apr. 29, 1976, 45).

The only hearing since the completion of the new jail was held on October 18, 1976 *on the subject of "contact visits"* (Tr. Oct. 18, 1976, pp. 1–6). *Thus, no hearing has been held since the new jail came into use on the "conditions" of housing pretrial detainees under the presently existing circumstances.* The new jail now has a *normal capacity* for 960 inmates and "with cellblocks 1 and 2 . . . [closed since the] summer [of 1976]" (Maj. op. p. —— of 188 U.S.App.D.C., p. 536 of 580 F.2d), the principal source for the complaint against the quality of housing conditions (as opposed to quantity) has been removed. *It follows that, with the new jail being the principal source for housing inmates, the old record is stale and does not present substantial evidence sufficient to support the application of the court's order to the new and radically changed presently existing "conditions"—concerning which no evidence has been adduced. The case involving, as it did, the old jail is thus moot—the conditions to which the plaintiffs' complaint and the trial court's hearings were addressed, no longer exist. The factual record in this case does not address the present operating conditions in the jails to which it is addressed. The order is thus not supported by substantial evidence and has become moot.*

During the April 29, 1976 hearing before the trial court some concern was expressed over the status of the case involving the old jail because the Court of Appeals had pointed out that "the new jail is about to open." At that time the trial court indicated it thought that statistics with respect to the old jail would be sufficient, by merely adding the normal capacity of the new jail, to support an injunction directing the operation of the new jail, and cellblocks 3 and 4 in the future. With such a material change in the housing of prisoners, as was occasioned by adding the most modern air conditioned accommodations for 960 inmates, the trial court rationally could not reach the conclusion it did. The factual record of the hearings did not address the situation in which the new jail became the principal detention facility. The court rationalized with plaintiffs' counsel as to this deficiency in the trial record:

THE COURT: You can load the record with what *has* happened. . . . [I]f it were not for what had happened, we wouldn't be here, right? . . . . And *that is about the only thing we can make a record on.* [This recognizes that a record could not be made against the new conditions]. You and I know when we get the testimony here that the prognosis is *fairly gloomy.* You and I know that they are overcrowded now [? see later comment], but I suspect that we don't have to delve into the business of projections. [They should have looked at the new conditions *in toto* if they wanted to issue an order directed to new conditions. The failure "to delve into the business of projections" is a fatal error by the standards even of the majority opinion because the court did not consider "whether defendants' illegal conduct is likely to recur . . ." [Maj. op. p. —— of 188 U.S.App.D.C., p. 541 of 580 F.2d] and cases there cited].

I guess we will nail down the capacity, right, and establish the fact that it *has been overpopulated,* and I suspect that ultimately you will ask me to fashion some relief that will prohibit it?

MR. HICKEY: That is correct.

THE COURT: *It doesn't make any difference about the projections* [involving the new jail] *if that is so.* [But the District Court could not determine whether "the allegedly wrongful behavior could . . . reasonably be expected to recur" [Maj. op., p. —— of 188 U.S. App.D.C., p. 541 of 580 F.2d] unless it went into the "business of projections," which it did not do].

MR. HICKEY: *I guess what I am thinking about is the Court of Appeals' language in the last stay order when they*

said that the new jail is about to open.. [This obviously was a disturbing thought to counsel, as it should have been to the Court].

This may be a bridge we don't have to cross. *They are in compliance today* [this is a contradiction of the prior statement that "they are overcrowded now."], so we will continue the stay of the overcrowding order [which was addressed to the old jail].

THE COURT: It seems to me, as you say, the subject matter of the lawsuit is the category of the people.

MR. HICKEY: That is correct.

THE COURT: Inmates wherever they are. [Actually the subject was inmate "conditions" at the old jail].

So, if that is so, then *I can deal with the old facility and the new facility as a composite.* [Without taking evidence]. It doesn't make any difference whether they are in the new facility or the Armory or wherever they are. [In other words that the court has a continuing ability because there was a lawsuit directed at "conditions" in the old jail to thereafter deal with all D.C. prisoners wherever they are. Such wholesale expansion of the court's authority on a stale complaint and a stale record is unwarranted].

It seems to me I deal with it in terms of other people. And if that is so, it seems to me we can avoid what Mr. Nedrich [the Assistant U.S. Attorney] is talking about. Do you understand what I am saying to you?

MR. NEDRICH: Yes.

THE COURT: You and Miss Crisman talk about that, and the three of you talk about that. I think that is feasible.

I agree what [sic] what you are saying. We went into that before, you know.

I though [sic] we might have some leeway. I thought we might have, you know, *but there is no head space.*

I think we can get enough record to satisfy the Court of Appeals with what has happened up to now and *what glimpse we get into what is going to* happen tomorrow. *We don't have to unveil them all if he thinks somebody with anxiety and and [sic] neurosis is going to fill up the new jail.*

Tr. Apr. 29, 1976, pp. 165–67 (emphasis added).

It is apparent from this colloquy that the underlying theory, subsequently announced by the court in its order, was that if the capacity of the old jail was established and such facility *had* been overpopulated, and there was a "gloomy prognosis," the court, just by taking a *"glimpse . . . into* what is going to happen tomorrow" (emphasis added) with the new jail, and without "delving into the business of projections," could decree the population limits of cellblocks 3 and 4 and the dormitories, merely add the normal capacity of the new jail and, without any further testimony showing *any present*, or projecting any future adverse effects from the operations and conditions of the facilities with the new jail, issue an injunction for the future against the *entire detention center*, new jail and all. The majority find that the *"forecast"* of the trial court, based on no more substantial evidence than a mere "glimpse," constitutes "sufficient evidence in the record to sustain" the injunction, p. —— of 188 U.S.App.D.C., p. 542 of 580 F.2d. The "forecast" and the "glimpse" however, without hearings and substantial evidence to indicate that past conditions will continue into the future, merely add up to nothing more than speculation and conjecture and therefore the majority remand the record on the injunction phase of the case to the District Court to determine "if the anticipated overcrowding has in fact occurred." Maj. op., p. —— of 188 U.S.App. D.C., p. 543 of 580 F.2d.

In sum, the District Court by refusing to delve into "projections" not only did not look into the future, it did not even look at the present conditions. It rested its case on the past and ignored the new jail completely except to tack on its *normal* capacity to the capacity of the restrained units and fix that as a limit. The difficulty with such conclusion is that the *"if"* is too specula-

tive, particularly when the District Court refused to consider *any* testimony as to the *ultimate capacity* of the new jail if some of the available areas were converted to dormitories. When the trial court, in the colloquy set forth at page —— of 188 U.S.App. D.C., p. 560 of 580 F.2d *infra* (Tr. Apr. 20, 1976, p. 96) said to the United States Attorney: "You don't want to advertise the top figure [maximum capacity for the new jail at 1700 people] no matter what it is"; and the United States Attorney answered affirmatively: "Right"; and the court stated: "*I am not* interested in advertising it either . . ." (Emphasis added); at that point the court indicated it was "not interested" in hearing any testimony as to the maximum capacity of the new jail. *Cf.* Maj. op., n. 45. It should have been if it intended to include the new jail in its injunction and adjudicate the capacity of the new jail that was not based on any substantial evidence as to its *maximum* capacity. The court thus never made a supportable finding as to the exact capacity of the new jail or to "conditions" there. This is a fatal defect in its order.

Since there is no evidence here covering the actual handling of 960 prisoners with the new jail in full operation, with Cellblocks 1 and 2 closed, or as to the *maximum* capacity of the new jail, the trial court's order in respect thereto is clearly erroneous. The trial court made the same error that was made by the trial courts in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). In *Rizzo* the Court opinion quoted the following from *O'Shea:*

> In *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) . . . the Court concluded that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy *regarding injunctive relief*, however, if unaccompanied by any continuing, present adverse effects." *Id.*, at 495–496, 94 S.Ct. [669] at 676. The Court further recognized that while "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," the attempt to

anticipate under what circumstances the respondents there would be made to appear in the future before petitioners "takes us into the area of speculation and conjecture." *Id.*, at 496–497, 94 S.Ct. 669. *Rizzo v. Goode*, 423 U.S. at 372–373, 96 S.Ct. at 605. (emphasis added). On the foregoing reasoning the Supreme Court held the record indicated that "the individual respondents . . . lacked the requisite 'personal stake in the outcome,' *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), i. e., [of] the order overhauling police disciplinary procedures." 423 U.S. at 373, 96 S.Ct. at 605. The majority do not satisfactorily distinguish *Rizzo*. Maj. op., pp. ———— of 188 U.S.App.D.C., p. 526 of 580 F.2d.

A mere threat of future injury is insufficient to avoid mootness. *Poe v. Ullman*, 367 U.S. 497, 507, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *United Public Workers v. Mitchell*, 330 U.S. 75, 89–90, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *see also, DeFunis v. Odegaard*, 416 U.S. 312, 318, 349, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 406–407, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). The majority's warning that we should "beware of efforts to defeat injunctive relief by protestations of repentence and reform" (Maj. op., p. —— of 188 U.S.App.D.C., p. 541 of 580 F.2d quoting *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952)), has no application here in view of the substantial change in circumstances occasioned by the completion of the construction and opening of the new jail, which was on the drawing boards even before this lawsuit was initiated. The new jail is an actuality not a promise.

While the controversy set forth in appellants' complaint is clearly moot, the majority are insistent upon extending the court's jurisdiction to assume complete control over the present situation and thereby more or less take over the management of the new jail on a continuing basis. That is not the lawsuit that was the subject of the court's hearings, and I see no justification for it.

However, on remand, the District Court will be required to take evidence on the maximum possible capacity of the new jail and will be able, if the complaint is amended to include present conditions, to examine the defendants' actual record of performance in the first two years of operating the new jail—evidence far stronger than mere "protestations of repentence and reform" unaccompanied by any identifiable actions or changes in circumstances.

The transcript reference quoted above makes it clear that the district court considered that the "past wrongs" were sufficient, without any substantial investigation of the presently changed situation, to support an injunction against future operations. In thus relying on past wrongs and not delving into the business of projections the court relied upon speculation and conjecture, instead of substantial evidence, and in so doing it is submitted it issued a judgment that is clearly erroneous.

## V. POTENTIAL ADDITIONAL INMATE CAPACITY

At the hearing on April 29, 1976, counsel for the District of Columbia defendants stated:

> If we were pushed to the wall [with the new jail] we think we could hold 1700 people and still comply with Your Honor's order and not double house. We could put . . . bunk beds in the . . . [recreation facility] and house 30 to 40 men in each of the 12 [recreation facilities]. Now, we are talking about 400 more spaces.[4]

Tr. April 29, 1976, pp. 95–97. *The trial court did not inquire further into this po-*

*tential capacity.* It should have, even though the court and the defendants seemed to have some reluctance against "advertising" it.

> THE COURT: You don't want to advertise the top figure no matter what it is.
>
> MR. NEDRICH: Right.
>
> THE COURT: I am not interested in advertising it either . . .

(Tr. April 29, 1976, 96). At this stage of the hearing it is not evident that the United States Attorney was aware that the court intended to include the new jail in its injunction without taking testimony thereon. This is evident from the following statement of the U.S. Attorney:

> MR. NEDRICH: . . . I don't think your Honor would issue an order saying, "Everything is fine now, but I am going to order you in the event something goes wrong six months from now to do this."
>
> It doesn't take that much effort to move men around *and put bunks in*, but don't tell the world that is what we are going to do.

(Tr. April 29, 1976, 99–100, emphasis added). The reference to bunks clearly indicates that using bunks for overflow inmates was clearly contemplated. That the court was going to include the new jail in the order in the manner it did developed later (*Id.*, Tr. April 29, 1976, 165–67). However, if the court intended to fix a limit on the number of prisoners that could be housed in the new jail it was required to determine the "top figure." The 1537 figure set by the order of May 24, 1976[5] did not consider evidence

---

4.

| | |
|---|---|
| New Detention Center | 960 |
| Hospital spaces | 75 |
| Penthouse | 10 |
| Cellblocks 3 & 4 | 650 |
| Total | 1,695 |

More comfortable accommodations in Cellblocks 3 & 4 would be 480, leaving a total of 1,525. The extra 400 would provide for 2,095 and 1,925 respectively.

5. The trial court considered that defendants should be enjoined from housing after June 1, 1976 more than the following:

| | |
|---|---|
| New Detention Facility | 960 |
| Cellblock 4 | 215 |
| Cellblock 3 | 161 |
| Dormitory 1 (Old Jail) | 110 |
| Dormitory 2 (Old Jail) | 91 |
| Total | 1,537 |

as to the *maximum potential capacity* of the Detention Center with the new jail and no testimony was ever taken thereon or as to conditions and operations at the new jail. Thus, because the District Court did not consider the full facts of the situation to which it addressed its order, it is clearly erroneous.

The majority opinion in footnote 44 quotes a portion of testimony that *in passing* referred to the maximum *designed* capacity (Tr. April 29, 1976, 97) of the new facility and then relies upon that isolated question and answer as a substitute for full inquiry into the maximum *potential* capacity of the new jail—which it is not. It is clear from the record that the trial court recognized that it was not. It is also crystal clear that the trial court did not desire to have a hearing on the maximum *potential* capacity of the new facility. This is self-evident from the court's statement shortly after the colloquy quoted by the majority opinion in footnote 44:

> THE COURT: . . . I don't know whether I am making myself clear to you or not, but for instance, *I don't want to get involved in dealing with the new facility and what is going to happen there* . . .

(Tr. April 29, 1976, 98, emphasis added). No statement could more clearly demonstrate, *after* the testimony the majority relies upon (n. 44), that the trial court recognized that the statement as to the maximum *design* capacity of the new facility did *not* constitute adequate inquiry into what the maximum *potential* capacity would be found to be if the court was "to get involved in dealing with the *new facility.*" It is this void in the present record, whereby the court refused "to get involved in dealing with *new facility*" as it should have, if it intended to base its order on the maximum *potential* capacity, that renders the present record inadequate. This inadequacy requires the court "to get involved" and determine the maximum *potential* capacity,

and the operating conditions that justify judicial intervention, if it intends to include the *new facility* in its injunction. Actually, however, since the lawsuit did not apply to the new facility, in my view there is no basis for getting involved in the lengthy hearing on the operation of the new facility that would be necessary in order to justify the extension of the court's injunction to cover the new facility.

The foregoing is a further indication that the trial court is basing its conclusion on a stale record that ignores the materially altered factual situation that resulted when cellblocks 1 and 2 of the old jail were closed and new normal accommodations for almost a thousand inmates were added by the completion of the new jail.

I see no need for a further remand on the question of overcrowding and inmate capacity. Since there is no showing that there are any existing violations, I would hold that the opening of the new jail, and the closing of the older parts of the old jail, have rendered this controversy moot. The plaintiffs have not alleged that there exist any unconstitutional conditions of confinement in the new jail, conditions which are substantially different from those in the old jail to which this entire litigation has heretofore been addressed. Judicial intervention into jail operations is justified only in extraordinary circumstances. Such circumstances have not even been alleged-much less explored in thorough evidentiary hearings or proven—with respect to the new jail, which was constructed for the purpose of alleviating many of the conditions in the old jail of which these plaintiffs first complained after the new jail was in progress.

## VI. ATTEMPTS TO ALLEVIATE OVERCROWDING

The trial court found in its Proceedings on Remand, filed May 24, 1976 "that the defendants have failed to take reasonable and obvious steps to alleviate overcrowding" and on that basis indicated that an

injunction should issue enjoining them from housing after June 1, 1976 "more than[:]

960 persons at the *New Detention Facility* . . .

215 in Cellblock 4 . . . [6]

161 in Cellblock 3 . . . [7]

110 persons in Dormitory 1 . . .

91 persons in Dormitory 2 at the old jail.[8]

(R. 166, p. 14). There is no justification for including the new jail in any injunction. There is no substantial evidence to support the court issuing a managerial injunction to control the *operations* of a facility that had never been shown to have been operated improperly and concerning which the court had never conducted any hearing on its *operations*. In fact, it had not been placed into full operation so the court could not have taken testimony on its operations. The court properly could not base an injunction regulating its future operations on pure surmise and speculation. There is no basis for including the new jail in an injunction just because Cellblocks 1 and 2 [9] (now demolished) were antiquated and there had been prior overcrowding at the old jail. Also, there is no basis for limiting the population of the new jail to 960, without a hearing as to whether more inmates might properly be housed as suggested by counsel at the hearing.

In addition, while it does not completely defeat the court's ability to issue an injunction limiting the jail population in the *old jail*, the justification is undercut by the several alternative steps that the court stated were "reasonable and obvious to alleviate overcrowding." (R. 166, p. 14). While these steps, suggested by the trial court, might be "obvious" to consider, it is not "reasonable" to conclude that they would materially reduce the jail population. The trial court "suggested" 10 "alternatives" (A to J) which it characterized "remain open as options." (R. 166, pp. 9–14). Are they reasonable options? Consider them seriatim:

A. *Lorton* Youth Centers 1 and 2 has its population controlled by an order of Judge Gesell. Suggestion: get Judge Gesell to increase the population limits. Impractical.

B. Confine youth offenders *at Lorton* while they are being evaluated as to their eligibility for a youth correction sentence. It is illegal to confine youth offenders in an adult facility or in an institution not certified by the Attorney General as a Youth Facility. 18 U.S.C. §§ 5011, 5012.[10] To suggest that youth offenders should be taken from a jail and confined in a penitentiary while they are awaiting sentence is too extreme to even consider. It flies into the face of the entire Youth Corrections Act.

C. Confine persons serving misdemeanor sentences in the minimum security facility at *Lorton*. This was rejected because of insufficient security at such facility in Lorton. This involves a judgment factor by the administrators which should be respected by the court. Those guilty only of mis-

---

**6.** The findings also indicated: "In addition, after June 1, 1976 no persons should be housed in Cellblocks 1 and 2 at the Old Jail." (R. 166, p. 14).

**7.** That Cellblocks 3 and 4 were found to furnish satisfactory accommodations for 376 inmates indicates that *conditions* in those cellblocks were satisfactory.

**8.** *Id.*

**9.** *See* text Maj. op. pp. ———–—— of 188 U.S. App.D.C., pp. 533–536 of 580 F.2d.

**10.** The relevant statutes provide:

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.
18 U.S.C. § 5011.

No youth offender shall be committed to the Attorney General under this chapter until the Director shall certify that proper and adequate treatment facilities and personnel have been provided.
18 U.S.C. § 5012.

demeanors should not be imprisoned with felons—or be placed in maximum security prisons such as Lorton.

D. Misdemeanor sentences to the jail by judges should be changed to specify "half-way houses." The sentencing judges know the available facilities and presumably sentence with all the alternatives in mind—including half-way houses. This suggestion would limit the sentencing judges' choice of alternative dispositions on a basis which should be irrelevant to the judges' decisions on sentencing.

E. Speed up transportation by U.S. Marshals of parole violators temporarily confined at jail. This should be done as expeditiously as possible, if it is not, but doing so would not substantially affect the jail population.

F. Install "demountable" housing units, *i. e.,* trailers. The administrators previously considered these and concluded they were unsatisfactory.

G. Obtain the "consent" of those convicted of misdemeanors to confine them at *Lorton* penitentiary. Such consents would obviously be few. And there is no validity in the suggestion that 24 D.C.Code § 425, which allows for transfers of those convicted of D.C. offenses, would supersede 18 U.S.C. § 4083, which provides that misdemeanor sentences "shall not be served in a penitentiary without the consent of the defendant." The federal statute is supreme, and it applies to "[p]ersons convicted of offenses against the United States." *Id., supra.* This includes those convicted of District of Columbia offenses. *Beard v. Bennett,* 72 U.S.App.D.C. 269, 270, 114 F.2d 578, 579 (1940) (Rutledge, J.).

H. Obtain the consent of judges for those sentenced to serve weekend sentences to serve them in half-way houses. This had some prior success and could be repeated, but its effect would be minimal.

I. Transfer to *Lorton* those convicted prisoners that the sentencing judge recommended serve their sentences in a federal penitentiary, to stay at *Lorton* until the Attorney General acts on the recommenda-

tions. This has some elements, of feasibility, but no sentenced prisoners are transferred to Lorton or any other institution until the Attorney General designates the place of confinement, and it is doubtful that they would make two designations.

J. Locate other space. The trial court's opinion states, "no substantial efforts have been made by the Department to locate alternative housing facilities within the District of Columbia or at the *Lorton* Complex." (R. 166, p. 13). This statement is contradicted by statements made at the various oral arguments of this case. At that time other facilities, even outside D.C. and *Lorton* were discussed. This suggestion has great facial merit but is of little practicality because in the long run it is *permanent* space that they assert is needed. Getting substantial additional jail facilities is a major undertaking. It should be pursued vigorously, but in light of the present situation, the failure to walk in step with the court's suggestion does not authorize an injunction without convincing proof that the *present jail facilities,* new jail and Cell-blocks 3 and 4, will be operated in an *unconstitutional* manner.

Many of the foregoing suggestions are laden with another objection—6 out of the 10 suggestions bring in the use of *Lorton Reformatory* which, in some instances would not be legally permissible, and the defendants state *it also is overcrowded.* In addition judicial notice is taken of the decision of the United States District Court for the Eastern District of Virginia, issued on June 30, 1976 in Civil Action No. 75–392A, *Board of Supervisors of Fairfax County, Virginia v. Edward H. Levi [Attorney General] et al.,* which finds, *inter alia,* that "overcrowding" at Lorton is a problem and that there are "insufficient personnel" to adequately supervise the number of inmates presently confined, even though "defendants convicted of federal . . . offenses . . . are no longer incarcerated [there] . . . ." When this court's judgment is added to Judge Gesell's order of a similar nature addressed to Lorton youth facilities, it is obvious that other courts block the trial court's suggestions. There-

fore, the several suggestions that *Lorton* can help out seem not to be well taken. In view of this interplay between the D.C. Jail and the Fairfax County Board, it seems that the court's order in this case to deny the request of the Fairfax Board to intervene in this case was ill-advised. Intervention was requested on March 25, 1975 (R. 119A). No question is raised presently about this, but it seems clear that the intervention of the Fairfax Board would have permitted a better consideration of all the relevant facts.

On the foregoing analysis I disagree with the assertion that pursuing the above alternatives would obviate the problem. Maj. op., n.7.

## VII. THE RELEASE OF PRISONERS

The District Court entered the following order directing the automatic release of prisoners in the event the population limit of 1,537 inmates, based mainly on the stale hearing, is exceeded:

> ORDER . . . if compliance requires a reduction in the inmate population at either facility, and other efforts to reduce the population are not successful within 48 hours after compliance ceases, the Director of the Department of Corrections and the Superintendent of Detention Services be directed to release on their own recognizance, within 48 hours of the admission to either facility of persons in excess of the numbers stated in the preceding paragraph, those pre-trial detainees held in default of the lowest amount of bail, and among those detainees held in the same amount of bail those held for the longest time, until compliance with that Order is obtained; provided that if the Board of Judges of the Superior Court, or the Chief Judge thereof, specify a different method of selecting the persons to be released, the defendants shall be governed accordingly.

District Court Order of May 24, 1976, pp. 14–15; *Campbell v. McGruder,* 416 F.Supp. 111, 117 (D.D.C.1976); and see Maj. op., n.43.

This order, directed to future operations, as it is, is not based on substantial evidence and I concur in what I construe is the refusal of the majority to affirm this order. Maj. op. p. —— of 188 U.S.App.D.C., p. 543 of 580 F.2d. In directing the "release on their own recognizance," of prisoners in excess of the limit fixed by its order, the District Court is in effect exercising *habeas corpus* jurisdiction *in futuro* without any court consideration. In most instances this would involve D.C. prisoners and this might exceed its jurisdiction. *Swain v. Pressley,* 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977).

Recognizing the disparity that exists between judges in setting bail, it is also my view that release should not be automatically based on the amount of bail. Rather, if such a situation should ever arise, on motion of the United States Attorney it should be brought to the attention of the judges of the court whose prisoners are to be released. The present order wholly ignores United States judges. The release of prisoners who are incarcerated because they cannot meet the ultra liberal release provisions of the Bail Reform Act should not be ordered on a perfunctory basis. If the drastic remedy of release was to be applied, the *proper court* should consider the alternative of releasing some of those serving misdemeanor sentences who are nearing their expiration date. Under the operation of the very liberal D.C. Bail Act, a pretrial detainee who is confined in the jail is most likely apt to have committed a very serious crime and to be a serious risk to the community. Such people should not automatically be released. It is also submitted that the comparative severity of the crime with which low bail detainees are charged should be a factor to be considered in releasing prisoners. Finally, it almost goes without saying that Superior Court judges of the District of Columbia should not pass on the release of prisoners confined pursuant to judgments of conviction and orders of United States District Court.

## VIII. RECREATION

The majority affirms the District Court's finding that the opportunity for some form

of recreation must be provided to all inmates. It vacates the District Court's order requiring that this be *outdoor* recreation, but remands "for a determination of the quality, duration and location of this recreation." I see no problem with respect to recreation, and therefore no need or justification for the court to become involved with the question at all at this time.

The Department of Corrections is not opposed to proper outside recreation. What the District Court's order is referring to is not ordinary physical recreation, but more frequently than not means just "hanging out in the rec. [recreation] yard—just walking around or just playing basketball freely" (Tr. Apr. 29, 1976, pp. 104–105). However, the new jail has 16 adequate recreational areas *inside* the detention facility and only two outside recreational areas. *This is a jail not a penitentiary or reformatory.* If the responsible authorities decide to establish recreational programs *inside* the jail that is within the supervisory power which inheres in their responsibility to manage the institution. Those administering the new jail would prefer to use the outdoor recreational facilities for *planned* recreational events—organized teams, etc. (Tr. Apr. 29, 1976, p. 105). They also may come to *some* more extensive outdoor recreation in the future. Juveniles presently receive daily outdoor exercise, and the trial court found that plans for outdoor exercise were being developed. Maj. op., n.48. This is an instance where we should follow Justice Powell's admonition in *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):

> [C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.

When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

The defendants provide the opportunity for recreation. Since that is so, I do not see the justification for our intervening in this matter at all. The "quality, duration, and location" of jail recreation is to my mind a matter for the determination of the jail authorities over which judicial supervision is unnecessary—no inadequacy being shown. I therefore would vacate the District Court's order in this respect and would not remand for further consideration of this issue.

No fundamental constitutional guarantee is violated by establishing for *jail* inmates a program of one hour of indoor recreation daily instead of outdoor idling. As a matter of fact one hour of *indoor* recreation in air conditioned facilities may be far superior to outside, so-called recreation—summer and winter. It must also be remembered that we are dealing here only with pretrial detainees. Those who are in some correctional institution to serve an extended term have some right and special need for exercise that is not shared by pretrial detainees. Inmates in *jail* are there for shorter periods and are less in need of exercise. The assurance of one hour indoor exercise for those in jail awaiting trial is very reasonable and certainly more than most jails provide for pretrial detainees.

## IX. THE CLASSIFICATION SYSTEM AND CONTACT VISITS

The order of the District Court of November 5, 1975 directs the D.C. defendants to:

> 4. Establish a classification system which will make it possible to determine a) which inmates of plaintiff class require maximum security confinement; and b) which members of class can enjoy *contact visits* without jeopardizing the security of the facility. (p. 12). (Emphasis added).

If a classification system for pretrial detainees could determine that jails would be

easy to administer, maybe the majority can suggest the system it has in mind. Insofar as requiring a classification system is concerned, this court once affirmed an order of the District Court requiring prison officials to grant press interviews of inmates on the basis of a classification system of individual inmates on the ground that, under the First Amendment, any blanket prohibition of such interviews was prohibited. The Supreme Court, however, reversed, holding that an even-handed blanket prohibition equally applicable to all inmates did nothing more than limit a manner of communication, was "entitled to great deference," and, as such, did not unconstitutionally encroach on inmate rights. *Saxbe v. Washington Post Co.,* 417 U.S. 843, 844–49, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). *See also Pell v. Procunier, supra,* 417 U.S. at 823–26, 94 S.Ct. 2800, 41 L.Ed.2d 495.

The majority "do not interpret [the foregoing] order [of the District Court] as *mandating* contact visits *at this time*" (Maj. op., p. —— of 188 U.S.App.D.C., p. 547 of 580 F.2d, emphasis added). Therefore the majority defers ruling on the validity of ordering them, remands this part of the court's order and affirms the order "insofar as it *requires* the defendants to devise a classification system for maximum security assignments *and contact visits* . . . [that will permit] the District Court to proceed with the fashioning of an order on the subject of contact visits if it is so advised; such an order, of course, will be subject to later appeal." Maj. op., p. —— of 188 U.S. App.D.C., p. 548 of 580 F.2d (emphasis added).

The procedure ordered is most strange. It is contradictory and, while disclaiming judgment, is almost suggestive. The majority affirms an order *directing* defendant to classify prisoners for "maximum security . . . and *contact visits*" (emphasis

added) and at the same time states that it does not interpret the District Court's order, which it affirms, as requiring contact visits. Actually it operates in reverse of the normal order. From my examination, *there is no foundation in the record to support an order directing defendants to prepare a classification system for contact visits until a record is made supporting the necessity and validity of ordering contact visits.* Therefore, until the necessary predicate is proved, I would conclude there is no necessity for the defendants preparing any classification system for contact visits. The same goes for maximum security classification—which is part of the contact visit issue in the mind of the majority—but so far as this case is concerned I fail to see how the plaintiffs have shown any standing to raise that issue. Just because there may have been some overcrowding in the past does not authorize a prisoner to attack everything in the management of a jail. At this time there is no necessity to discuss the validity of ordering contact visits, but I will deal with them if they are ordered.

What is involved in this issue of contact visits is that, pursuant to the considered judgment of the D.C. officials, the new jail, for security reasons, has been constructed so that there will be *no contact visits* except between prisoners and their lawyers and religious emissaries.[11] This is a decision that is clearly within the legal power and discretion of the jail authorities, and in my opinion on the record to date they were most wise in deciding the matter as they did.

It was the "contact visit" portion of the trial court's original order, affirmed by two judges of this panel, that has been stayed by our Circuit Justice. A reading of the transcripts in *United States v. Gorham et al.,* 173 U.S.App.D.C. 139, 523 F.2d 1088 (1975) and *United States v. Bridgeman et*

---

11. The new jail has two types of facilities for visitors, namely, small cubicles, or rooms, designed to provide for attorney-client visits on a face-to-face basis in complete privacy, and booths to accommodate general visitors. These booths, which are air conditioned, will separate visitor from inmate via a clear parti-

tion, and will require communication by telephone line. No inmate at the new facility, regardless of classification or whether he is assigned to a work detail, will be able to have general contact visits. (Tr. December 30, 1975, 4; A. 480) (Appellants' Br. p. 29).

al., 173 U.S.App.D.C. 150, 523 F.2d 1099 (1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1744, 48 L.Ed.2d 206 (1976), involving the recent riots and mass jail breaks at the D.C. Jail, reveals some of the recognized evils of "contact visits." Such visits were the principal means used by the conspirators to cause both the riots and the escapes which ensued. Both the riot and the escapes occurred after planned "contact visits" to the principal conspirators. *United States v. Wilkerson,* 179 U.S.App.D.C. 15, 548 F.2d 970 (1976) and *United States v. Gorham,* 175 U.S.App.D.C. 363, 535 F.2d 1325 (April 1, 1976 Order and Memorandum) (hostages held by jail prisoners at cellblock in U.S. Court House, Washington, D.C.), were also recent cases where a contraband gun was obtained in some manner by two defendants confined in the D.C. Jail. The gun was subsequently used to obtain other weapons and terrorize hostages for several days.

It is generally recognized that weapons, hacksaw blades, knives, files, etc., which constitute an obvious means of breaching "security," are not the only hazards or abuses that result from "contact visits." One need only focus on the threats to security of the jail that result from breaches of its administrative regulations by prisoners importing other articles contrary to administrative regulations. Security at a jail cannot be easily assured by searches for weapons of those making contact visits or by running visitors through a metal detection screen. Security can be just as much violated by a breach of the administrative regulations when visitors making contact visits import drugs, money and other articles of value to inmates. Possession of drugs and money is a violation of jail regulations, and both can be and are used to effect escape, purchase weapons and otherwise interfere, through bribery, in the proper administration of a jail or other penal institution.

The expressed theory of the trial court is thus incorrect, and I vigorously dissent therefrom, that "none of the marijuana constitutes any real threat to the security of the institution" (Tr. October 18, 1976, 183) and that "the fact that some items of

contraband get into the institution is [not] sufficient justification for walling off the institution from the type of visits that other people have found to be [beneficial]." This bespeaks an ignorance of actual D.C. Jail conditions—known to all. (*Id.,* 171–72). When the risk to the security of the institution and others was brought up in opposition to this line of reasoning by the District Court, the judge replied: ". . . other people are taking a chance. You take a chance when you walk down the street." (*Id.,* 172). The theory of the trial court, now affirmed on a temporary partial basis by the majority, but subject to further appeal (an odd disposition) is that the District Court can interpose its will and compel the jail authorities to risk the security of the jail, its inmates and the public even though the jail authorities, with good reason, based on experience and common practice, have decided that such risk is undesirable and unnecessary and that this risk is justified because people take risks when they "walk down the street." I submit that the two situations are not comparable. That citizens are subject to some risks when walking on the streets of Washington is no justification for increasing that risk by further action that might hazard the security of inmates in the jail and the general public. In my view that decision is within the lawful authority of the jail administrators to make, and since their decision is rational and based on substantial evidence it should be sustained. On this record the courts lack power to overrule the jail administrators.

After three *major* jail incidents within one year (one massive jail break and two hostage incidents), when the circumstances of those armed riots, etc., are analyzed, it cannot be denied that better security is needed at the jail. Drugs are difficult to detect in many visitors who may be allowed contact visits and the detection of money and valuables is not always considered too important by some. *If contact visits are allowed there is no foolproof method to stop the introduction of contraband drugs.* (Tr. Oct. 18, 1976, 69, 122, 138–39). Detection also requires considerable manpower and

appropriations which may not be fully available from Congress. Thus, the problem is not solely confined to discovering guns and other direct threats to jail security. Money and drugs can buy guns and weapons.

It is also fallacious to consider the problem as though the *sole consideration* were that the detainees were presumed to be innocent. Discussing the "presumption of innocence" with respect to an accused person whom the court or magistrate, in accordance with the Constitution and statute, has determined *must be confined* because he is a danger to the community or there is no reasonable assurance that he will not flee, raises an issue that is largely irrelevant to his pretrial *confinement.* While the presumption of innocence is an active factor weighing on whether he should be released or not, once that presumption is rebutted by competent evidence and it is determined that he must be confined, the effect of the presumption is largely in repose until the time of trial, given of course that the nature of his confinement must be reasonably accommodated to mere confinement and not ordinarily to involve solitary confinement, prohibition of visitors, hard labor, etc.[12] To say that pretrial detainees have the protection of the presumption is not to say that the dangerous characteristics of pretrial detainees are to be ignored in their confinement.

The majority opinion in n.14 attempts to deny this fact but ends up merely with a strong plea for a liberal bail policy which for some time has been established law and policy in the District of Columbia. It is this bail policy that has placed only the most dangerous prisoners in the D.C. Jail. It is hard to conceive a more liberal bail policy than the presently existing one. In fact, the public and some Congressmen have begun to complain of its extreme liberality. Under the existing Bail Reform Act of the District of Columbia (23 D.C.Code § 1324), accused persons who should not be detained in jail pretrial are *not* detained.

The majority attempt to divert the effect of this fact by asserting that nearly all the plaintiff unconvicted predetainees are jailed because "they cannot afford bail." Maj. op., n.14. This is a myopic appraisal of the situation. It fails to see that they are jailed because they cannot afford bail *in the amount fixed.* And the amount varies with the magnitude of the crime, the danger to the community posed by the accused and the strength of the evidence against him. Under the law in the District of Columbia a

---

12. The majority opinion at page —— of 188 U.S.App.D.C., p. 529 of 580 F.2d in characterizing the foregoing comments on the presumption of innocence fails to consider the complete comment. Mr. Justice White in *Coffin v. United States,* 156 U.S. 432, 458–59, 15 S.Ct. 394, 404, 39 L.Ed. 481 (1895) described "the presumption of innocence [as] a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven to be guilty." Its most frequent application occurs in criminal trials. *Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972); *Coffin v. United States, supra.* The majority apparently considers that pretrial detention violates the presumed innocence of the pretrial detainee. Maj. op., p. —— of 188 U.S. App.D.C., p. 530 of 580 F.2d. This is an incorrect appraisal of the extent of the right. The presumption is a *rebuttable* one, not absolute. The force of the presumption just does not prevail over the evidence upon which pretrial confinement may be ordered. Thus no

"paradox" exists when the limitations of the presumption are understood. It is also incorrect to infer from the fact that presentence incarceration is credited upon federal sentences that such credit exists as a right flowing from the presumption of innocence. Maj. op., p. —— of 188 U.S.App.D.C., p. 530 of 580 F.2d. The source is entirely statutory, 18 U.S.C. § 3568, and such credit is not constitutionally required. *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973).

*Cummings v. Missouri,* 4 Wall (71 U.S.) 277, 321–22, 18 L.Ed. 356 (1866), and *Brown v. Wilemon,* 139 F.2d 730, 732 (5th Cir.), *cert. denied,* 322 U.S. 748, 64 S.Ct. 1151, 88 L.Ed. 1579 (1944) cited at page —— of 188 U.S.App. D.C., at page 530 of 580 F.2d of the majority opinion, are wholly irrelevant to this case. They both consider whether denying a person the right to operate his business or practice his profession is "punishment," and merely note in passing that deprivation of liberty is a form of "punishment." They contribute nothing to the inquiry before us.

person who is arrested and charged with a criminal offense:

> . . . at his appearance before a judicial officer, [is] ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer, unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the . . . appearance of the person as required or the safety of any other person or the community.

23 D.C.Code § 1321(a). If such determination is made, the magistrate must then consider outside custody, travel restrictions and only if these are not considered to be sufficient is bail required. In reaching its conclusions the court or magistrate must consider the following factors:

> (b) In determining which conditions of release, if any, will reasonably assure the appearance of a person as required or the safety of any other person or the community, the judicial officer shall, on the basis of available information, take into account such matters as the *nature and circumstances of the offense charged, the weight of the evidence against such person*, his family ties, employment, financial resources, character and mental conditions, *past conduct*, length of residence in the community, *record of convictions*, and any record of appearance at court proceedings, *flight to avoid prosecution*, or failure to appear at court proceedings.

23 D.C.Code § 1321(b) (emphasis added).

Naturally, when these statutory standards are applied to offenders charged with very serious crimes or who have substantial records of prior convictions, or who are apt to flee the jurisdiction, and against whom the evidence of guilt is strong, a substantial amount of bail must be fixed. This results in the District of Columbia, with its very substantial load of serious crimes, in a number of situations where substantial bail must be fixed or else permit such persons to roam free in the community and hazard the populace. The majority attempts to paint this situation as one of discrimination against the poor because they are poor. That conclusion, however, is not supported by the statistics. It is a fact that few persons who are well to do commit armed robberies. So the most liberal Bail Act in the nation cannot actually be faulted in application; but of course if the theory expressed by the majority opinion is followed practically no person charged with crime would be detained until after his conviction was finally affirmed by the Supreme Court. That is an unreasonable position and misconstrues the Constitution which permits dangerous criminals to be confined prior to trial—though our Bail Act has substantially reduced this protection and in some instances obliterated it.

In the application of the Bail Reform Act in the District it is common knowledge, and proved by some of our cases, that many accused persons who have been released have subsequently committed very serious crimes while released, proving they should not have been released to prey upon the community. But they were, and the Act so provides. It leans in favor of releasing the accused. Apparently the majority are even dissatisfied with this.

Thus, those remaining pretrial detainees who are confined in jail, and who are the subjects of this litigation are those who, for the most part, it has already been determined are individuals (1) whose appearance at trial would not be reasonably assured if they were released, or whose release would not (2) "reasonably assure the safety of any other person or the community." In other words the individuals who are in jail are those that the judicial process has already determined are likely to flee the jurisdiction or constitute a dangerous threat to some person or to the community.

It thus appears that *the population of the jail is already the result of classification by the bail standards.* They have been classified by the magistrates and courts. The inmates who are required by the Bail Act to

be confined are no less dangerous when they are confined. Therefore the jail authorities should not be required, *against their judgment*, to order contact visits for any group of prisoners that have failed to qualify for release under the very liberal Bail Reform Act of the District of Columbia.

If those responsible for administering the D.C. Jail decide in the interest of better security to run a jail with no contact visits, it is my opinion that such decision is within their competence to make. Since this opinion was written the First Circuit has reached a similar conclusion. *Feeley v. Sampson*, No. 76–1508, 570 F.2d 364 at 372–373 (1st Cir. January 18, 1978). Recent events have proved that better security is needed at the jail and that contact visits were one of the causes of serious riots and mass jail breaks. Eliminating social contact visits would not be in any way discriminatory, and if the jail is properly constructed so that the risk of official contact visits could be reduced to the bare minimum, that would be a safer way to run the jail than the way the old jail was operated.

However, to my mind the decision is for the executive branch of government, and not for the courts. With the recent unsatisfactory jail incidents, two directly traceable to contact visits, the courts are in no position to second guess the present judgment of the D.C. correctional administrators in desiring tighter security, and the record here does not justify judicial intervention to override the judgment of the local officials. That they chose to tighten their security is commendable. Experience has demonstrated that it needs tightening. In these recent incidents, the jail authorities have found that just one small gun smuggled into the jail can put those in the jail in possession of a whole arsenal of guns and ammunition, and we know from the court records in those cases that contact visits were the cause of some of them. The status of the remand on contact visits thus does not bode well for the future.

All of the foregoing has some bearing on the "security" considerations to be evaluated in the matter. I am not unmindful of the decisions in some of the other districts dealing with this problem. Each one has a local flavor but the District of Columbia has its own special problems, too. We have our own Bail Act which is very liberal and we have our own special local crime problem which has some very serious offenders, and it has not been shown to my satisfaction that it is a violation of inmates' constitutional rights to run a jail in a reasonably secure manner that affords some protection to the public against riots, mass jail breaks and against private citizens being taken hostage.

## X. TRANSFER OF INMATES WITH PSYCHIATRIC SYMPTOMS

As for the regulations requiring the treatment and transfer of pretrial detainees with psychiatric symptoms, I agree that they must be given medical attention, but I do not think an order of this court is necessary, and in any order that was issued I would not set a dogmatic 48-hour time limit, which cannot be other than arbitrary. I would also permit a *medical doctor or* a psychiatrist to see a potential patient within the 24-hour period. *Cf.* Maj. op., p. —— of 188 U.S.App.D.C., p. 548 of 580 F.2d. *Medical* problems of individuals are not conducive to arbitrary handling by mandatory general orders of a court. The problem is difficult enough for doctors, even after personal examinations. Some potential patients require immediate attention and with others it can be deferred a substantial period of time. If I were to set a standard I would fix it at "within a reasonable period" after a finding of mental illness. This would require some patients to be transferred sooner than 48 hours, and for some the transfer could be delayed longer. The necessity for transfer depends upon the condition of the inmate, the availability of facilities, and the nature of the confinement or treatment he requires, and it is not within the province or *ability* of the judiciary to

fix an arbitrary time limit that will be proper for all cases. The District has an absolute obligation to an inmate in its custody to furnish medical assistance within a reasonable period after it learns of the necessity therefor, and beyond so stating, I would not impose any fixed time limit. I would not release a mentally ill person if some arbitrary time limit cannot be met.

In my view it is also wholly unnecessary and improper for this court to order a continuing monitoring of medical transfers by requiring a "written report" to the District Court whenever the jail authorities have special cause to deviate from the 48-hour rule. Our attention has not been called to sufficient conduct by defendants that would justify such court intrusion into the exercise of their administrative responsibilities. As with the possibility of future overcrowding the facts do not present a case of sufficient "immediacy and relevancy" to justify declaratory and injunctive relief. *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). The district court and the majority are overlooking the fact that primarily they have only judicial and not managerial power. They too quickly assume the latter.

## XI. CLEAN CLOTHING

As for the order on clean clothing and restraints, the defendants generally conform to the standards stated in the order of the trial court. Therefore, I do not find substantial evidence that defendants have engaged in unconstitutional conduct with respect to such matters, or are likely to do so in the future, and hence I consider the order and the affirmance thereof to exceed the court's jurisdiction.

## XII. MISCELLANEOUS

There are a few isolated statements in the majority opinion that should not go unanswered.

A. It is incorrect for the District Court to assert that "there has been no planning for dealing with this problem by the City or the Department." Quoted at Maj. op., p. —— of 188 U.S.App.D.C., p. 541 of 580 F.2d. Such statement is incorrect. The City and the Department, as early as 1969, and possibly sooner (long before this lawsuit was ever started), began planning to acquire adequate jail facilities. *See* n.1. The City has also considered the Court's suggested alternatives and cooperated with them to the extent that they were viable. The trouble is most of the court's suggestions were unworkable. See text at —— —— of 188 U.S.App.D.C., at 532–534 of 580 F.2d *supra*. It is also incorrect to characterize defendants' activities as "resistance." The trouble is the District Court and the majority are attempting to make a whipping boy out of a small group of defendants who have only a *limited* capacity to deal with the problem. Of course jail capacity should be adequate, but there is no factual showing in this record that *present* jail capacity and conditions are not *presently* adequate. No amount of repeating unsubstantiated assertions can supply this deficiency in the record.

B. How it is relevant to this controversy escapes me but the majority assert that those who are released prior to trial "[stand] a better chance of not being convicted or, if convicted, of not receiving a prison sentence." Maj. op., p. —— of 188 U.S.App.D.C., p. 531 of 580 F.2d. If that is a correct statement there is nothing remarkable or even noteworthy about it. *That is exactly as it should be.* The most serious offenders with the strongest evidence against them, with the most serious records, are the persons who are less frequently released and more frequently convicted and sentenced to prison for substantial terms. This is evidence that the standards of the Bail Act are being applied correctly.

C. Footnotes 20 and 21 of the majority opinion assert that pretrial detainees cannot be detained under " 'worse conditions than convicted prisoners' within the same penal

system." *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974) is cited for the stated proposition. It has some defects. Most prison systems of any size have institutions where prisoners are allowed varying degrees of security and liberty depending on the nature of the prisoner's offense, the duration of his sentence, the time remaining to serve, his prior record and his personal propensities. Thus, there are maximum security institutions, minimal security institutions and facilities where even great freedom is afforded the inmates—even halfway houses where convicted persons are free on their own part of the time. It is *absurd* to contend, much less hold, that pretrial detainees must be afforded the greatest amount of liberty afforded any convicted person. The "Son of Sam" in jail, prior to trial, should not be given a weekend furlough just because some inmate in prison received one.

Moreover, jail inmates are largely an unknown quantity. Jail officials know comparatively little about the backgrounds and propensity for violence or escape of each inmate. On the other hand, most convicted prisoners have undergone some type of diagnostic or classification procedure upon entry into the prison system, which gives the prison authorities some indication of which inmates will likely be able to handle relatively greater liberty without difficulty and with minimal danger to the public. Jail authorities, inherently unable to obtain equivalent information given the short-term nature of most jail detention, cannot reasonably be expected to give the undifferentiated mass of jail inmates the same degree of liberty accorded to those convicted prisoners deemed most trustworthy.

## RESTRAINTS

I concur in that portion of the majority opinion which confines its references concerning the use of restraints on patients to those who are or appear to be, mentally ill. Thus, the prohibition against "unpadded" handcuffs would not prevent the use of normal handcuffs on normal prisoners in circumstances where unpadded handcuffs are normally applied.

## CONCLUSION

Appellants have stated that if their position is not affirmed on this appeal they intend to petition the Supreme Court for a writ of certiorari to review the case.

The majority have decided part of the case and remanded the record on several very important issues to the trial court for further consideration, including contact visits, recreation, medical examination, and overcrowding and inmate capacity. This fragmentation of the case into two parts places appellants in an awkward position with respect to any petition for certiorari as it might compel their seeking a piecemeal review. In the light of appellants' request, and of the importance that contact visits be considered in the light of all the other issues, and on the full record, it is suggested, and I would so order, that a stay be granted as to the matters presently decided, until the district court rules on contact visits and the other remanded issues and our decision thereon becomes final. The trial court can act expeditiously on contact visits and the other issues. As I construe the stay orders of the majority this is what is intended thereby.

To the foregoing extent I respectfully dissent from the opinion of the majority.